SANDERS *v.* BAGGERLY.

Opinion delivered July 11, 1910.

1. RELIGIOUS SOCIETIES—DEDICATION OF PROPERTY.—A conveyance of real property to a trustee as a site for a church house "to be under the control, care and direction of the Cumberland Presbyterian Church" does not constitute a dedication for the purpose of propagating any particular religious faith or mode of worship, but for the use of the congregation of the Cumberland Presbyterian Church at the locality in question, or its legitimate successor. (Page 120.)

2. SAME—POWER TO FORM UNIONS,—In every church organization there is an implied or inherent power to unite with other church organizations. (Page 124.)

3. SAME—AUTHORITY TO FORM UNION.—Under section 60 of the Constitution of the Cumberland Presbyterian Church providing that "upon the recommendation of the General Assembly, at a stated meeting, by a two-thirds vote of the members thereof voting thereon, the Confession of Faith, Catechism, Constitution and Rules of Discipline may be amended or changed when a majority of the presbyteries, upon the same being transmitted for their action, shall approve thereof," the church is expressly authorized to unite with another church whose faith may be found to be in harmony with its own. (Page 128.)

4. SAME—MODE OF EXERCISE OF CHURCH POWERS.—Under the form of government of the Cumberland Presbyterian Church, all things which are done by the church as a whole must be done by the General Assembly and a majority of the presbyteries, in whom reside all the inherent powers of the church as a whole. (Page 129.)

5. SAME—CONCLUSIVENESS OF ECCLESIASTICAL DECISIONS.—Civil courts will not assume jurisdiction of controversies over matters purely of church doctrine or discipline, where no property rights are involved; and even in causes involving civil or property rights, when questions arise concerning matters of church doctrine or discipline which have been decided by a church court vested with such jurisdiction by church laws, the civil courts accept as final and conclusive the decisions of the ecclesiastical court. (Page 132.)

6. SAME—CONCLUSIVENESS OF ECCLESIASTICAL DECISIONS.—Under the Constitution and Confession of Faith of the Cumberland Presbyterian Church, the General Assembly was impowered to decide whether the doctrines of the Presbyterian Church in the United States of America and those of the Cumberland Presbyterian Church were in substantial harmony, and its decision to that effect was binding upon the church as a whole. (Page 135.)

7. SAME—SUBMISSION OF PLAN OF UNION.—The plan of union reported by the Joint Committee of the Presbyterian and Cumberland

churches, and adopted by the General Assembly of the two churches, provided that the plan should be submitted to the presbyteries by requesting a categorical answer to the question therein propounded. A resolution was adopted by the Cumberland Church instructing the moderator and stated clerk to submit the plan of union to the presbyteries, and this was done by means of a circular letter which submitted a question calling for a categorical answer, and stated: "While the vote is taken simply upon this question, your action thereon will mean the acceptance or rejection of the entire plan." *Held* that the entire plan of union was submitted to the presbyteries. (Page 137.)

8. SAME—CONCLUSIVENESS OF ECCLESIASTICAL DECISION.—A finding by the General Assembly of the Cumberland Church that the doctrines of the Presbyterian Church as revised or expounded in 1903 were in substantial accord with those of the Cumberland Church is conclusive upon the civil courts. (Page 139.)

9. SAME—MODE OF FORMING UNION.—If a church, acting through its General Assembly and presbyteries, is authorized both to change its doctrinal standard and to form a union with another church, there is no reason why both objects could not be effected at the same time and by the same vote, if both questions were properly submitted. (Page 140.)

10. SAME—CONSOLIDATION—NAME.—The union between the Cumberland and Presbyterian Churches was not invalid because the name of the latter church was assumed. (Page 140.)

Appeal from Nevada Chancery Court; *James D. Shaver,* Chancellor; reversed.

*John M. Gaut, McRae & Tompkins* and *D. L. McRae;* for appellants.

Ecclesiastical decisions are binding on the courts so far as concerns ecclesiastical questions. 91 Tenn. 328; 92 Fed. 214; 106 Pac. 395; 129 Ga. 1; 154 Ill. 394; 58 Ill. 509; 23 Ill. 456; 13 Wall. 679; 218 Ill. 503. The local church is bound by the orders and judgments of the courts of the church. 102 Tex. 324. Union among churches is a perfectly legitimate part of their purpose and their freedom. 41 Pa. 9; 88 Pa. 60. The General Conference represents the sovereign power of the church. 16 How. 288; 90 S. W. 106; 17 Ia. 204; 21 N. Y. 9; 115 S. W. 691. Their union does not destroy the identity of either. 134 Ill. App. 620; 129 Ga. 1. A specific trust is one in which the muniment of title specifies the doctrine to be taught. 13 Wall. 679; 129 Ind. 486; 14 L. R. A. 518; 91 Tenn. 328; 15 L. R.

A. 801. Every donation is made with an implied reference to all of the powers of the church. 198 Ill. 626. A State adopting a statute or constitution of another State adopts it with the construction placed upon it by the State of its creation. 187 Ill. 65; 61 Ill. App. 476; 97 Ill. 421; 161 U. S. 591; 117 Fed. 123; 146 Ind. 466; 150 Ind. 216; 1 Cranch 299; 146 U. S. 37; 41 Pa. 9; 16 How. 288; 14 Bush 256. Where a particular construction is long acquiesced by the church, it becomes established law. 17 Mass. 143; 9 Am. Dec. 123; 1 Cranch 299. The court will take judicial notice of the recorded history of the church. 1 Wheat. 304; 4 Yerg. 528; 18 N. J. Eq. 13. A legislative body is presumed to be consistent with the general policy of the church or State. 92 Tex. 275; 47 S. W. 967; 82 Me. 265; 19 Ala. 465.

*Hamby, Haynie & Hamby* and *W. C. Caldwell,* for appellees.

The conveyance created a specific trust for the support of the doctrines of that church. 145 Ind. 361; 32 L. R. A. 839; 83 Ia. 147; 13 L. R. A. 198; 96 Ia. 55; 31 L. R. A. 141; 63 N. H. 9; 16 Am. R. 82; 67 Pa. 138; 5 Am. R. 415; 87 Va. 103; 11 L. R. A. 214; 91 Tenn. 305; 11 Heisk. 458; 79 Miss. 488; 30 So. 714; 121 Tenn. 676; 222 Mo. 613. A court of equity will prevent a diversion of church property in every instance. 12 Wright 20; 67 Pa. 138; 1 Dan. 1; 3 Meriwale 353; 13 Wall. 680; 67 Pa. 138; 7 B. Mon. 489; 108 Tenn. 173; 10 Bush 318; 80 Ky. 443; 5 Bush 112; 14 B. Mon. 39; 54 Mo. 343; 42 Ga. 562. The scheme contemplated the absorption and extinguishment of the Cumberland Presbyterian Church and is therefore void. 121 Tenn. 556; 120 S. W. 873; 222 Mo. 613; 121 S. W. 805; 87 N. E. 1091. The powers of the higher courts of the Presbyterian Church are defined and limited by its constitution. 2 Bush 333; 5 Bush 115; 89 Pa. 97; 5 Yerg. 272; 15 N. Y. 543; 108 S. W. 447; 8 Lea 167; 4 N. J. Eq. 69; 222 Mo. 613. Where the organic law provides for a change to be made in some particular manner, such change can be effected in no other way. 14 L. R. A. 528; 24 *Id.* 621; 6 *Id.* 422; 22 *Id.* 175; 98 Mich. 279; 156 Pa. 119; 93 Pa. 479; 22 Neb. 375; 69 Ind. 505; 46 O. St. 677; 24 Kan. 709; 14 R. I. 651; 26 L. R. A. 78; 24 Ala. 109; 54 Wis. 318; 60 Ia. 543. Church constitutions are treated as contracts. 2 Sawy. 655; 94 U. S. 523; 2

Daly 239; 4 Abb. N. C. 300; 2 Brewst. 571; 25 Kan. 177; 75 N. C. 134; 11 Phila. 166; 14 Bush 278. Constitutional authority must be shown by those asserting it. 89 Pa. 97; 67 Pa. 138; 5 Am. Rep. 415; 2 Bush 332; 5 Bush 110. Civil courts decide civil rights for themselves. 156 Ind. 209; 145 Ind. 361; 97 Ind. 423; 35 Ind. 201; 15 Wall. 131; 12 Bush 541; 71 N. E. 627; 163 Pa. 534; 29 L. R. A. 476; 24 S. W. 52; 36 Neb. 564; 113 Mich. 375; 71 N. W. 627; 62 Ia. 567; 17 N. W. 747; 89 Pa. 97; 56 N. J. L. 401; 18 Vt. 511; 79 Miss 488; 98 Mich. 279; 24 L. R. A. 615; 11 Heisk. 458; *Id.* 523; 91 Tenn. 304; 104 Tenn. 665; 108 Tenn. 173; 54 Mo. 377; 31 Ill. 35; 149 Mass. 341; 21 N. E. 868; 222 Mo. 613; 121 S. W. 805; 121 Tenn. 556; 120 S. W. 873.

McCULLOCH, C. J. This action, which was instituted in the chancery court of Nevada County, involves the question of title, control and use of certain real estate situated in that county at or near Artesian, which, in the year 1885, was conveyed by certain individual owners to a trustee as a site for a church house "to be under the control, care and direction of the Cumberland Presbyterian Church." It is insisted on one side (that of the defendants) that the above-quoted language in the deed created a specific trust for the propagation and support of definite religious doctrines or principles, and that, regardless of other questions in the case, it is the duty of the court to prevent a diversion of the property from the trust attached to its use, and to confine its use to the support of the particular doctrines mentioned. They invoke the following rule, stated by Mr. Justice Miller in *Watson* v. *Jones*, 13 Wall. 679:

"It seems hardly to admit of a rational doubt that an individual or an association of individuals may dedicate property by way of trust to the purpose of sustaining, supporting and propagating definite religious doctrines or principles, provided that in doing so they violate no law of morality, and give to the instrument by which their purpose is evidenced the formalities which the laws require. And it would seem also to be the obvious duty of the court, in a case properly made, to see that the property so dedicated is not diverted from the trust which is thus attached to its use. So long as there are persons qualified within the meaning of the original dedication, and who are also willing to teach the doctrines or principles prescribed in the act of dedi-

cation, and so long as there is any one so interested in the
execution of the trust as to have a standing in court, it must
be that they can prevent the diversion of the property or fund to
other and different uses. This is the general doctrine of courts
of equity as to charities, and it seems equally applicable to ecclesi-
astical matters."

In that opinion Judge Miller classified under three general
heads the questions which usually come before the civil courts
concerning rights of property held by religious organizations:

"1. The first of these is when the property which is the
subject of controversy has been, by the deed or will of the donor,
or other instrument by which the property is held, by the ex-
press terms of the instrument, devoted to the teaching, support
or spread of some specific form of religious doctrine or belief.

"2. The second is when the property is held by a religious
congregation which, by the nature of its organization, is strictly
independent of other ecclesiastical associations, and, so far as
church government is concerned, owes no fealty or obligation
to any higher authority.

"3. The third is where the religious congregation or ecclesi-
astical body holding the property is but a subordinate member
of some general church organization in which there are superior
ecclesiastical tribunals with a general and ultimate power of con-
trol more or less complete, in some supreme judicatory over the
whole membership of that general organization."

Of the first class above mentioned the learned judge used
the language just quoted, and of the second class he said: "The
second class of cases which we have described has reference to
the case of a church of a strictly congregational or independent
organization, governed solely within itself, either by a majority
of its members or by such other local organism as it may have
instituted for the purpose of ecclesiastical government; and to
property held by such a church, either by way of purchase or
donation, with no other specific trust attached to it in the hands
of the church than that it is for the use of that congregation as
a religious society. In such cases, where there is a schism which
leads to a separation into distinct and conflicting bodies, the rights
of such bodies to the use of the property must be determined by
the ordinary principles which govern voluntary associations. If

the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the property."

And of the third class he said: "It is the case of property acquired in any of the usual modes for the general use of a religious congregation which is itself part of a larger and general organization of some religious denomination, with which it is more or less intimately connected by religious views and ecclesiastical government. * * * Here is no case of property devoted forever by the instrument which conveyed it, or by any specific declaration of its owner, to the support of any special religious dogmas, or any peculiar form of worship, but of property purchased for the use of a religious congregation, and so long as any existing religious congregation can be ascertained to be that congregation, or its regular and legitimate successor, it is entitled to the use of the property. In the case of an independent congregation we have pointed out how this identity, or succession, is to be ascertained, but in cases of this character we are bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments."

We are of the opinion that the present case falls within the third class referred to, and not the first. For the language of the deed is not sufficient to dedicate the property conveyed to use in the propagation or support of any particular religious faith or mode of worship. The property is conveyed for the use of the congregation of the Cumberland Presbyterian Church at Artesian, or its legitimate sucessor, and falls within the third class described by Judge Miller.

The property rights involved in this controversy turn on the question of the validity or invalidity of the so-called "Reunion and Union" claimed to have been effected in the year 1906 of the Presbyterian Church in the United States of America, popularly called the Northern Presbyterian Church, and the Cumberland Presbyterian Church, popularly called the Cumberland Church. The validity of those proceedings seems to be seriously called in question throughout the territorial bounds of the Cumberland Presbyterian Church as it existed when the union was

formed, and litigation concerning property rights which depended on the solution of that question has arisen in nearly, if not all, the States within those bounds. Already the courts of last resort of eight States have passed on the question, viz.: (in the order in which the decisions have been rendered) Georgia, Texas, Kentucky, Tennessee, Missouri, California, Indiana and Illinois. All of those courts except those of Tennessee and Missouri held the union to be valid. *Mack* v. *Kime,* 129 Ga. 1, 58 S. E. 184; *Brown* v. *Clark,* 102 Tex. 323, 116 S. W. 365; *Wallace* v. *Hughes* (Ky.) 115 S. W. 684; *Landrith* v. *Hudgins,* 121 Tenn. 556, 120 S. W. 783; *Boyles* v. *Roberts,* 222 Mo. 613, 121 S. W. 805; *Permanent Comm. of Missions* v. *Pacific Synod. Pres. Ch.,* (Cal.) 106 Pac. 395; *Ramsey* v. *Hicks,* (Ind.), 91 N. E. 344; *First Pres. Ch. of Lincoln* v. *First Cumb. Pres. Ch.* (Ill.), 91 N. E. 761.

In the controversy which has thus arisen, those who favor the union and litigate on that side are called Unionists, and those who litigate on the other side are called Loyalists. Each side claims the right to use and control the property owned by the Cumberland Church prior to the union. The Loyalists base their claim on the theory that the Unionists, by an abortive attempt to unite with the Presbyterian Church, have seceded from the Cumberland Church and forfeited their right to participate in the use of the property; whilst, on the other hand, the Unionists claim that the Loyalists, by failing to yield obedience to the legally consummated union, have become the seceders and forfeited their right to use the property. The right to control and use the property in controversy is therefore with the party which has the right of succession, and which can successfully identify itself, through its present ecclesiastical connection, with the continuation of the original church organization for whose use the property was granted. The party not found to be so identified is the real usurper. This is a question, too, which, under any view of the law announced in the many decisions bearing on this controversy, it is within the province of the civil courts to decide; and in doing so there is no invasion of the powers of church courts.

The questions for us to decide are, then, (1) Did the Cumberland Presbyterian Church as a church organization possess the power to unite with the Presbyterian Church; and, (2) Was

that power properly exercised so as to effectuate the union and carry with it the property rights involved?

The Cumberland Church had its origin in a schism in the Presbyterian Church concerning the construction of its Calvinistic doctrines, those who separated themselves from that church and organized another church contending that the doctrines of the Presbyterian Church were fatalistic, whereas the great body of the ministry and membership contended that the doctrines were not fatalistic. The Cumberland Church was organized in 1810, and adopted all the doctrinal standards of the mother church save those which were said to be fatalistic, and also adopted the same form of church government. Under the system of church government thus adopted, the church session, composed of the pastor and the ruling elders elected by the congregation, exercised jurisdiction over a single church; the presbytery, composed of the ministers and a ruling elder from each church, exercised jurisdiction over the churches within a prescribed district; the synod, composed of representatives from the churches, exercised jurisdiction over the presbyteries within its bounds, and the General Assembly, composed of commissioners sent by the presbyteries, exercised jurisdiction over such matters as concerned the whole church. The General Assembly is the highest court of the church, and represents in one body all the particular churches thereof.

The Cumberland Church grew rapidly, and presbyteries, synods and a General Assembly were organized, after the form of the Presbyterian Church government. Repeated overtures were made for reunion with the mother church, but all these came to naught until the movement began which resulted in the consummation of a union of the two churches in the year 1906. The Presbyterian Church at its General Assembly in 1900 inaugurated a movement to revise its Confession of Faith, and the revision was consummated in the year 1903. Chapters were added, and what is called a Declaratory Statement was adopted and added, which, as was and is claimed, removed the possibility of a fatalistic construction of its creed, and rendered it substantially in accord with that of the Cumberland Church. The General Assembly of each of the churches in 1903 appointed committees to negotiate a union of the two churches, and these

committees agreed upon a plan designated as a "Plan of Re-union and Union," and presented it to each General Assembly in 1904 as a joint report. The plan thus reported was as follows:

"That the reunion of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church be accomplished as soon as the necessary steps can be taken, upon the basis hereinafter set forth.

"1. The Presbyterian Church in the United States of America * * * and the Cumberland Presbyterian Church * * * shall be united as one church, under the name and style of the Presbyterian Church in the United States of America, possessing all the legal and corporate rights and powers which the separate churches now possess.

"2. The union shall be effected on the doctrinal basis of the Confession of Faith of the Presbyterian Church in the United States of America as revised in 1903, and of its other doctrinal and ecclesiastical standards; and the Scriptures of the Old and New Testaments shall be acknowledged as the inspired Word of God, the only infallible rule of faith and practice.

"3. Each of the assemblies shall submit the foregoing basis of union to its presbyteries, which shall be required to meet on or before April 30, 1905, to express their approval or disapproval of the same by a categorical answer to this question: Do you approve of the reunion and union of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church on the following basis: The union shall be effected on the doctrinal basis of the Confession of Faith of the Presbyterian Church in the United States of America as revised in 1903, and of its other doctrinal and ecclesiastical standards; and the Scriptures of the Old and New Testaments shall be acknowledged as the inspired Word of God, the only infallible rule of faith and practice? Each presbytery shall, before the 10th day of May, 1905, forward to the stated clerk of the assembly with which it is connected, a statement of its vote on the said basis of union.

"4. The report of the vote of the presbyteries shall be submitted by the respective stated clerks to the General Assemblies meeting in 1905, and if the General Assemblies shall then

find and declare that the foregoing basis of union has been approved by the constitutional majority of the presbyteries connected with each branch of the church, then the same shall be of binding force, and both assemblies shall take action accordingly."

This report was adopted by each General Assembly, and by two-thirds vote of each the basis of union was referred to the respective presbyteries for approval. A majority of the presbyteries of each church voted approval of the basis of union, thus submitted, and so reported to the respective General Assemblies in 1905, and by vote of both General Assemblies it was declared to have been adopted. The committees of each General Assembly were continued for the purpose of arranging the details of the union, and their action was jointly reported to each assembly in 1906 and adopted by each. Each assembly by a majority vote then declared the union to be consummated.

The first question to decide is whether or not the Cumberland Church had the power to unite with another church, and of this we readily conclude that such power existed. Nothing appearing in its Constitution to forbid, we are of the opinion that it possessed the inherent power so to do. Judge Neil of the Tennessee Supreme Court, in delivering the opinion of that court in a case involving the same questions now before us, so well expressed the views on this subject which meet our approval that we cannot do better than quote what he says. Though we are unable to reach the same conclusion that he did on the whole case, we find much to be commended in his opinion. He said this:

"In Christian thought, unity is more desirable than division. All denominational church organizations have as their primary object the propagation of the Christian religion. The individual advancement of each separate organization is looked upon as a contribution that far to the general cause. A union with another church organization having the same purpose may be regarded, therefore, as a step forward in the consummation of the work in which all are engaged. For this reason the general analogy of any secular corporation or association is misleading. The purpose of such an organization is self-aggrandizement, the advancement of its own interests, its increase in

power, in wealth, in strength, without regard to any other organization, to the prosperity or purposes of any other association of individuals. Such organizations have no common purpose, no common head, no invisible cords of union. Each stands alone. Each has property devoted to the special individual purposes of the society, and each has stockholders. A business corporation is organized for profit; and if its life is not limited by its charter, it is regarded as perpetual unless sooner ended for breach of law or duty, or inability to discharge its functions. In case of a termination of corporate rights by efflux of time, or for either of the causes last mentioned, the business is wound up, the property is sold, and the proceeds, after payment of debts, if any, divided among the stockholders. But with church organizations it is different. They are not created for either profit or pleasure, but to do good. They have property, but no stockholders. The possession of all churches are devoted to the same broad, general purpose, likewise the efforts of all of their members acting within the organizations. * * *

"There must be in every church organization an implied or inherent power of union with other church organizations, growing out of the purpose for which all are constituted, viz.: the dissemination of the Christian religion. If any two organizations reach the conclusion that they can better subserve this great and fundamental purpose by uniting with each other, and if they can agree, within their constitutional limits, upon the points of difference previously dividing them, there can be no reason, in law, why they should remain apart. There is no soundness in the view that church divisions, once made, must ever continue. If divisions in the Christian church were intended to be perpetual, then the argument for the defendants, on this head, is unanswerable; if there be such a thing as a universal church of which all the divisions are members or branches, if there be a tendency to unity in Christendom, and if this tendency is in accord with the spirit and purpose of Christianity—then the argument referred to can avail but little. * * *

"The power exists by implication. It exists from the very nature of the case, not only in the Cumberland organization, but in every other Christian society in whose standards there

is not an explicit pronouncement to the contrary, because they are all parts of one whole, all engaged in the same work, seeking the same end, and animated by a common purpose. But, although the power to form a union exists, it must be exercised in accordance with the manner indicated by the Constitution or consistent contract by which the organization is bound together."

The Indiana Supreme Court, in *Ramsey* v. *Hicks, supra,* reached the same conclusion expressed as follows: "It is our conclusion that the Cumberland Church had inherent power to unite with another ecclesiastical body whose doctrine and policy were deemed in harmony with its own, and that the authority to consummate such union was vested in its General Assembly, without the direct sanction of its lay membership; that that body did not usurp authority or transcend its powers, and, so far as this court has jurisdiction to pass upon that question, the reunion and union of that church with the Presbyterian Church, as declared by the General Assembly at Decatur, Illinois, was legal and valid, and binding alike upon its membership and upon the civil courts."

We are of that opinion, too. We think there was an implied or inherent power in the Cumberland Church to unite with another church whose faith should be found to be in harmony with its own. Moreover, there is ample express authority contained in the Constitution of the church for changing the doctrines so as to bring them into harmony with those of other churches; this, of course, under the implied limitation that the change should not be so fundamentally radical as to pass the reasonable bounds which the framers of the Constitution must be deemed to have had in contemplation. Instead of there being anything in the constitution of the church forbidding union with another church, there is a clear implication from the language of that instrument that such power existed, for it contains provisions broad enough to embrace that power and to point out the method of its exercise. Section 60 provides that, "upon the recommendation of the General Assembly, at a stated meeting, by a two-thirds vote of the members thereof, voting thereon, the Confession of Faith, Catechism, Constitution and Rules of Discipline may be amended or changed when a majority of the presbyteries, upon the same being submitted for their action, shall

approve thereof." How could language be broader, or express greater power? It says that *"the Confession of Faith, Catechism, Constitution, and Rules of Discipline may be amended or changed"* by the General Assembly and presbyteries in the methods pointed out. This covers everything which a church stands for—everything which justifies the separate existence of a church—doctrine, form of government and mode of worship. Even a change of name and separate identity falls within the wide sweep of this power.

But, if it did not expressly include the power to change the name and identity, what is there in the name and identity of a church which should stand in the way of a union of two churches having the same faith and mode of worship? Church organizations are not brought into being, like commercial corporations and purely social or fraternal organizations, for the purpose of preserving separate denominational identity. Churches merely represent the coming together of people sharing the same religious beliefs, or preferring the same mode of worshipping Almighty God, and name and separate identity are mere incidents. The only real lines of separation between churches are the differences in belief; and when these become harmonized, the lines of separation marked by distinct organizations remain as but shadows, without substantial justification.

Presbyterian church government is representative in form. Neither the constituent churches nor the members thereof legislate directly for themselves. The congregation of a church only elects the ruling elders who compose the church session, and the session in turn selects one of its members as a representative in presbytery. The sovereignty of the church is exercised by the General Assembly and the presbyteries acting together, the Assembly proposing legislation and the presbyteries approving or disapproving. They act for the whole church, and the will of a majority of all the presbyteries, acting with the General Assembly, expresses the will of all the particular churches. It is essentially a government of the majority. All things which are done by the church as a whole are, according to the letter of the Constitution, done by the Assembly and presbyteries, and all of the inherent powers of the church as a whole reside in those representative bodies. They constitute the residuum of all the powers,

executive, legislative and judicial, not expressly lodged elsewhere by the Constitution. Therefore, when the union was decreed by those bodies, the will of the whole church was spoken.

We again quote from the opinion of Judge Neil of the Supreme Court of Tennessee: "The Cumberland Presbyterian Church is a compact organization. Each individual congregation is bound to the presbytery over it by the fact that before it can become a Presbyterian congregation it must be received by the presbytery, and it cannot obtain a minister except by the consent of the presbytery, or make a contract with him; and when the contract is made by the consent of the presbytery, it cannot be dissolved except with like consent. There can be no doubt that if a congregation should refuse to obey this rule, or law, it would, during the continuance of such disobedience, be in a state of rebellion against lawfully constituted authority, and could be properly excluded from the body of the church. There can be equally no doubt that if a minority of the congregation, in such a case, should be willing to submit to the authority of the presbytery, it would be recognized by the civil authorities as the true congregation, and would be entitled to the possession and use of the church property. * * *

"The General Assembly then is made up of representatives of the people, that is, elders and representatives of the church at large, that is, ministers. Thus it is composed of all governing agencies. The sovereignty of the organization, however, does not reside in that body alone, or in the presbyteries, but in it and the presbyteries; each acting alone is limited to powers expressly given (Const., Sec. 25); when they act together, the whole governing body acts, the church at large, and the people themselves in and through their elders, who are the representatives of each several church. The power which makes or amends the Constitution, or constituent contract of the organization, is the power where sovereignty is lodged. This power is that of the General Assembly and the presbyteries acting together. * * *

"It may be for the good of the church, under some circumstances that may be conceived, to dissolve the organization, or to unite with another church on such terms as may be agreed upon. Such union may involve a change of name, or faith, or both. The constituent contract, the constitution, may point out

how both of these ends may be effected, and, if so, must be complied with. After these changes have been made, there may still remain the organization, the framework, of the church, which must, in effect, be dissolved by the act of union with another church. The authority to effect this must be found where the supreme legislative power of the organization resides, because it requires the exercise of the will, and the expression of the will of the whole organization as a unit, on a proposition affecting the whole in respect of its existence and organic activity. There being a question for the whole church, it cannot be a matter to be determined by the individual congregation. The whole church itself is a unit, a composite unit, it is true, but still a unit; and in determining questions addressed to it, it must act in accord with its nature, by that body or bodies through which it speaks its will."

The California court spoke as follows on the subject: "The evidence shows that in Presbyterian usage from its beginning all church power has been uniformly and universally considered and understood to be vested in the presbyteries and assembly. See *Fussell* v. *Hail,* 134 Ill. App. 634. The presbytery is the recognized church unit, and has a voice in affairs of this character. The assembly consists of representatives of the several presbyteries, and, as the Cumberland Constitution states, it is the 'bond of union' between them and 'represents in one body all the particular churches.' It declares and executes, for the whole church, the orders and judgments of the presbyteries expressed through their representatives assembled in and constituting the assembly. The highest governmental powers are always exercised and declared by their joint action in this manner, before any written constitution had purported to confer the authority upon them to do so. * * * The Presbyterian government is wholly representative in character. It has no characteristics of a pure democracy. The members exercise their will in such affairs, so far as they may under the Presbyterian system, in choosing the ruling elders, in selecting one of them as a representative to the presbytery, and in exerting their personal influence upon the ministers and ruling elders, by which means they doubtless frequently secure their desires. This government by representatives being the recognized rule of the church to which the members consented

when they joined, it cannot be said that there has been any viola-
tion of the compact between the church and its members, or any-
thing unfair in the method of effecting the union." *Permanent
Comm. of. Miss.* v. *Pac. Syn. Presb. Ch., supra.*

It is insisted that the respective doctrines of the Presbyterian
Church and of the Cumberland Church were so radically and
fundamentally different that they could not be harmonized and
that no union of the two churches could be consummated.

We understand the law to be well established by the great
weight of authority that on questions of church doctrine or disci-
pline the civil courts are governed exclusively by the decisions
of the church courts, or judicatories, so-called, where such courts
are created and vested with authority under the constitution of a
given church to decide those questions. To state the rule more
broadly: Civil courts will not assume jurisdiction of controver-
sies purely over matters of church doctrine or discipline, where
no property rights are involved; civil courts will assume juris-
diction only of causes involving civil or property rights,
and in such causes, when questions arise concerning mat-
ters of church doctrine or discipline which have been
decided by a church court vested with such jurisdiction by church
laws, the civil courts accept as final and conclusive the decisions
of the ecclesiastical court. This rule is well stated by the Supreme
Court of Indiana as follows: "Civil courts in this country have
no ecclesiastical jurisdiction. They cannot revise or question
ordinary acts of church discipline, and can only interfere in church
controversies where civil rights or the rights of property are in-
volved. Where a civil right depends upon some matter pertain-
ing to ecclesiastical affairs, the civil tribunal tries the civil right,
and nothing more, taking the ecclesiastical decisions, out of which
the civil right has arisen, as it finds them, and accepting those
decisions as matters adjudicated by another jurisdiction. The
civil courts act upon the theory that the ecclesiastical courts are
the best judges of merely ecclesiastical questions, and of all mat-
ters which concern the doctrines and discipline of the respective
religious denominations to which they belong." *White Lick, etc.* v.
*White Lick etc.,* 89 Ind. 136, quoted with approval in *Ramsey* v.
*Hicks, supra.*

*Watson* v. *Jones, supra,* is the leading case on this subject, and we think it announces the correct rule. Judge Miller in the opinion, said: "In this class of cases (speaking of cases which involve property rights growing out of divisions in church government similar to that of the Presbyterian system) we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and State under our system of laws, and supported by a preponderating weight of judicial authority, is that whenever the question of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them. * * * The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent, and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their rights to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for."

It must be remembered that this was said in a case involving the right to use and control church property. In other words, a property right was involved, and the court held that in adjudicating the right of property the decision of the church judicatory would be accepted as binding on the civil courts.

Judge Lurton, speaking for the United States Circuit Court of Appeals for the Sixth Circuit, in the case of *Brundage* v. *Deardorf,* 82 Fed. 214, very fairly and forcefully announces the same rule as follows: "What effect will a civil court give to the interpretation and construction by the highest judicatory of an ec-

clesiastical body of its own fundamental law? Is that judgment
subject to review in the civil courts? Or will the civil courts
accept the interpretation placed upon the organic law of the
church by its highest judicatory, and apply the law so interpreted
to the settlement of property questions depending upon that law?
As we have already stated, the property here involved was not
devoted by the express terms of any grant, gift, will or sale to
the support of any specific religious dogma, doctrine or belief,
but is property acquired by the church for the general use of the
society for religious purposes, and with no other limitation. The
property here in question is held for the particular use of a con-
gregation, which is only one of numerous others united to form
a general body of churches, and subject to the ecclesiastical con-
trol of the general conference, whose jurisdiction extends to all
congregations composing the general body. The question here
presented is merely one of identity—which of the two bodies
claiming to be the legitimate successor of the original united
organization is the legal successor of the body to which this
property was conveyed? When this question is answered, the
property must be awarded to that organization. The decision of
this question involves the interpretation of the organic law of the
church in respect to the appropriate method of altering or amend-
ing that law. But that fundamental law has been construed, inter-
preted and applied by the highest judicatory of this church before
its division, and the very changes in the Constitution and confes-
sion now complained of as irregular and revolutionary sanctioned
and approved as having been made in accordance with the method
prescribed by the fundamental law of the church for its own
amendment. Shall we review that decision, and overturn its con-
clusiveness upon questions purely relative to ecclesiastical law and
government, and take from the majority the general property of
the church upon some difference of opinion as to whether the
highest authority within the church had not mistaken the meaning
of the church organic law? The question is not an open one in
courts of the United States. It is the duty of this court under the
law as settled to accept that decision as final and as binding upon
it in so far as that decision has application to the case for de-
cision."

It is not a fair statement of the question to say that under this
view the civil courts abdicate their functions and act merely as

clerks and sheriffs to record and execute the judgments of the ecclesiastical courts. In holding to this view the civil courts merely declare settled principles of law applicable to other controversies by enforcing the compact of parties who have agreed to abide the decision of a tribunal created by themselves to settle disputed questions peculiar to the matter which is the subject of the compact. Apt illustrations of the application of these principles are found in cases involving constructions of contracts, wherein the contracting parties have agreed to submit matters in dispute concerning the quality, quantity or manner of construction of the work to engineers or supervising architects. In such cases the courts have invariably upheld such contracts and decisions rendered in accordance with their terms, unless they are subject to impeachment for fraud or gross mistake. *Ark.-Mo. Zinc Co.* v. *Patterson,* 79 Ark. 506, and cases cited. So with church controversies, where, by the Constitution of the church, which is the solemn compact between all its members, the matters pertaining to church doctrine or discipline are to be left to the highest church courts for decision, the decision of such questions by those courts are binding upon the civil courts when they arise in controversies involving civil rights or rights of property.

There can be no doubt that under the Constitution of the Cumberland Church the General Assembly was vested with complete power to decide questions of that kind. We find the following in the Constitution:

"Section 40. The General Assembly is the highest court of this church, and represents in one body all the particular churches thereof. It bears the title of the General Assembly of the Cumberland Presbyterian Church, and constitutes the bond of union, peace, correspondence and mutual confidence among all its churches and courts."

"Section 43. The General Assembly shall have the power to receive and decide all appeals, references and complaints regularly brought before it from the inferior courts; to bear testimony against error in doctrine and immorality in practice, injuriously affecting the church; to decide in all controversies respecting doctrine and discipline; * * * to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrine and order of this church."

Section 3 of the Confession of Faith reads in part as follows: "It is the prerogative of these courts, ministerially, to determine controversies of faith and questions of morals, to set down rules and directions for the better ordering of public worship of God and government of His church, * * * and authoritatively to determine the same, which determinations are to be received with reverence and submission."

Did the General Assembly of the Cumberland Church decide that the doctrines of the Presbyterian Church as revised in 1903 were in substantial harmony with the doctrines of the Cumberland Church? We think this was so decided. The General Assembly adopted the joint report of the Committee on Fraternity and Union, which declared that "such agreement now exists between the system of doctrine contained in the Confessions of Faith of the two churches as to warrant this union;" and which also declared that the revision of 1903 of the Confession of Faith of the Presbyterian Church "reveals a doctrinal agreement favorable to reunion." Besides this, the General Assembly adopted a resolution declaring "that, in the reunion and union of the Cumberland Presbyterian Church and the Presbyterian Church in the United States of America on the doctrinal basis of the Presbyterian Confession of Faith as revised in 1903, the Cumberland Presbyterian Church does not surrender anything integral in its own system of doctrine as set out in its own Confession of Faith, nor modify in any particular its adherence to the Word of God as the only infallible rule of faith and practice; nor has the Presbyterian Church asked or expected us to do so."

The decision of the General Assembly as the highest judicatory of the church on the question of the substantial identity of the doctrines could not, we think, have been more distinctly enunciated. We must, therefore, treat that question as settled. Nor is there any force in the suggestion that this decision should not be held binding because it represents the decision of one faction of the church. It was the decision of the General Assembly of the Cumberland Presbyterian Church as a whole. At that time there was no division of the church, though there were factions within the church, one favoring and the other opposing union. But the General Assembly of the Cumberland Presbyterian Church as a separate organization before the union was consummated, or claimed to be consummated, made this decision,

and it was a decision binding upon the whole church as it then existed.

Since we find that the two churches each possessed the power to unite, and that the authority to consummate the union rested in the General Assembly and the presbyteries acting together in the mode specified in section 60 of the constitution, the remaining question is, was the power exercised in the constitutional mode so as to effectuate the union?

It is contended on behalf of the Loyalists that the whole plan of the basis of union was not submitted to the presbyteries —that only a portion of the plan was submitted, viz.: a union "on the doctrinal basis of the Confession of Faith of the Presbyterian Church is the United States of America, as revised in 1903, and of its other doctrinal and ecclesiastical standards;" but that the other part of the plan, for a union of the two churches "under the name and style of the Presbyterian Church of the United States of America, possessing all the legal and corporate rights and powers which the separate churches now possess," was never submitted to nor approved by the presbyteries of the Cumberland Church. This is one of the points on which the Tennessee and Missouri courts held the union to be invalid, and learned counsel for defendants have urged here with much earnestness that such is the correct view of that question. We cannot, however, yield assent to that view. We are not prepared to say that it was essential that the change of name should have been submitted to the presbyteries, if the other points of the basis of union were properly submitted to and approved by the presbyteries. If all else was approved by the presbyteries in the constitutional mode, and the union properly arranged on the agreed doctrinal and ecclesiastical standards, it would seem that the General Assemblies of the two churches had the power to choose a name for the united churches. We will not go into a discussion of that question, for it is clear to us that the whole plan of the union was in fact submitted to and approved by the presbyteries.

It will be observed that this plan of union reported by the joint committee and adopted by the assembly, prescribed the mode of its submission to the presbyteries. Section 3 provided that the plan should be submitted to the presbyteries by requesting a categorical answer to the question therein propounded. A

resolution was adopted instructing the moderator and stated clerk of the assembly to submit the plan of union to the presbyteries, and this was done in the form of a circular letter, sent out by the moderator and stated clerk in the following form:

"To the ............ Presbytery:

·    "Dear Brethren:  By referring to the minutes of the last meeting of the General Assembly (pages 25, 55a, 30, 44, 48), you will see that, in the constitutional manner, the assembly has submitted to the presbyteries a proposition pertaining to the reunion and union of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church, and you are asked to give due consideration to the same and vote thereon. This proposition is to be put before the presbytery in the following terms:

" 'Do you approve of the reunion and union of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church on the following basis:  The union shall be effected on the doctrinal basis of the Confession of Faith of the Presbyterian Church in the United States of America, as revised in 1903, and of its other doctrinal and ecclesiastical standards, and the Scriptures of the Old and New Testaments shall be acknowledged as the inspired Word of God, the only infallible rule of faith and practice?'

"To this question the presbytery is to give categarical answer. While the vote is taken simply upon this question, your action thereon will mean the acceptance or rejection of the entire plan, embracing the basis of union, concurrent declarations, and recommendations, without amendment or alteration in any part." (See minutes, pages 62a, 65a.)

"For the information of the presbyteries, the amendments to the Westminister Confession of Faith and the brief statement of the reformed faith have been printed in the assembly minutes. (See pages 72-77.)

"The vote of the presbytery is to be taken on or before April 30, 1905, and the accompanying certificate of the vote is to be returned to the assembly's stated clerk before the 10th day of May, 1905.

"W .E. Settle, Moderator.

"J. M. Hubbert, Stated Clerk.

"Marshall, Mo., September 6, 1904."

What more was needed to bring the whole plan before the presbyteries for their approval or disapproval? It was as if the assembly had said to the presbyteries: "Here is the whole plan of union set forth in four sections; signify your approval or disapproval of the whole plan by answering categorically the question propounded in the third section." Is it conceivable that the ministers and members composing the presbyteries did not understand, when they voted an answer to the question set forth in the letter of the moderator and stated clerk, that they were approving or disapproving the whole plan of union on the basis of taking the name and adopting the doctrinal and ecclesiastical standards of the Presbyterian Church? We think not. To so hold would be to attribute to the presbyters a degree of intelligence far below the average of mankind in this country. The submission letter not only referred to the whole plan, but cited the pages of the minute book of the assembly where it could be found, and called attention to the fact that the answer of the presbyteries to the one question set forth would mean acceptance or rejection of the whole plan.

The proceedings were not conducted along technical lines, and should not be subjected to a technical scrutiny which would defeat the obvious intention of those who participated. The presbyters are presumed to have been men of at least average intelligence; and it is also to be presumed that they possessed themselves of all the facts concerning the whole plan of union and the effect of the votes which they were called on to cast. Nothing, it seems to us, could be plainer than the manner in which the plan was submitted, and we are unwilling to say that it was or could have been misunderstood by the members of the presbyteries. We say that the whole plan was submitted to and adopted by the presbyteries.

It has been suggested that, while it was within the power of the assembly and presbyteries, acting under section 60 of the constitution, to amend or change the doctrines of the church so as to bring them into harmony with those of another church, and then to unite with that church, both powers could not be exercised at the same time; in other words, that the doctrines must first be changed so as to harmonize with those of the church with whom the union is sought, and then separate proceedings be taken

to effect a union. We do not think this position is tenable. In the first place, it is sufficient answer to this to say that, according to the decision of the General Assembly on the ecclesiastical question, which we hold is binding on the civil courts, no substantial change was made in the doctrines of the Cumberland Church. When the Presbyterian Church in 1903 revised its Confession of Faith, not changing, it maintained, but expounding or elucidating its doctrines so as to dispel the fatalistic construction placed on them by some other churches, the General Assembly of the Cumberland Church decided that those doctrines as thus revised or expounded were in substantial accord with the doctrines of the Cumberland Church. Therefore, no change was made in the doctrines of the Cumberland Church, according to the decisions of its highest judicatory. It simply adopted the doctrinal standards of the Presbyterian Church, which were found, after the so-called revision of 1903, to be in substantial accord with its own.

But, even if it be conceded that the act of forming the union involved a change in the doctrines of the Cumberland Church, both could be accomplished by one vote. If the church, acting through the assembly and presbyteries, had the power to change its doctrinal standards and form a union with another church, both could be done at one and the same time and by the same vote, if both questions were properly submitted. Until the union became actually consummated, each of the churches preserved its separate identity, and remained in the exercise of its sovereign power, and could decree a union at the same time that it changed its doctrine. Both questions could be determined at the same time.

It is unimportant, so far as it affects the validity of the union, whether the name and doctrinal standards of the Presbyterian Church had been adopted, or whether those of the Cumberland Church had been adopted, or whether some other name and other harmonious doctrinal standards had been adopted. The result would have been the same, for, if the churches had the power to unite, they could have adopted any name and any doctrinal standards found to be in harmony with their own. A union would have been the result in either case which it was within the power of the churches to effectuate.

We discover no force in the refined distinctions sought to be

made between union and merger and absorption. Absorption re-
sults in union, and the Cumberland Church had the power to
unite with the other church by adopting the latter's name and doc-
trinal standards so as to become merged into the other organ-
ization.

We conclude, therefore, that the union between the two
churches was legally consummated, and the Unionists must suc-
ceed in this controversy. The decree below should have been in
their favor.

We have not cited all the authorities bearing on the question,
though we have examined them in an effort to give the case the
careful consideration demanded by the great interests involved,
contenting ourselves with citation of the cases in other States
concerning this particular controversy as to the validity of the
union. The opinions in those cases refer to all the authorities,
and leave little to be said on the subjects discussed. We have at-
tempted no more than a restatement in different form, as briefly
as found practicable, of the controlling principles of law so ably
discussed in those opinions. The opinions of the intermediate
appellate courts which considered those questions have also been
found helpful in arriving at a conclusion. *Clark* v. *Brown*, 108
S. W. (Tex. Civ. App.) 421; *Ramsey* v. *Hicks*, 89 N. E. (Ind.
App.) 597.

The decree of the chancellor is reversed, and the cause re-
manded with directions to enter a decree in accordance with this
opinion.

WOOD and HART, JJ., dissent.

HART, J., (dissenting) My only reason for filing a dissenting
opinion in this case is to give a brief summary of the views which
prompted my disagreement with my brother judges. I shall not
attempt any citation of authorities; for all the cases bearing di-
rectly on the question at issue have already been cited in the
majority opinion, and the interested reader will find that the
various opinions and dissenting opinions already delivered have
exhausted the subject. I shall say nothing concerning the de-
sirability of church unity; for that I consider a matter for the
churchmen and not for the civil courts.

The Cumberland Presbyterian Church has a representative
form of government. It has adopted a written constitution, and

a careful consideration of the instrument leads me to the conclusion that it is one of granted powers. Certain ecclesiastical bodies, commonly called church courts, are created, and upon them are conferred certain executive, legislative and judicial functions.

Section 25 of the Constitution specifically names the church courts created and prescribes the limits over which each may exercise jurisdiction, and concludes as follows: "and the jurisdiction of these courts is limited by the express provisions of the constitution." Other sections of the constitution specifically enumerate the powers, whether executive, legislative or judicial, of each of the church courts; and reference must be had to that instrument for any authority which each of these courts may assume to possess. The constitution must be considered as a whole, and each section read in connection with others relating to the same subject.

Bearing in mind these settled rules of construction, I have examined the organic law of the Cumberland Presbyterian Church, and have been unable to find any section or part thereof which has, in express terms or by necessary implication, conferred upon the church courts or judicatories the power to dissolve the church and to form a union with another religious society.

Section 43 of the constitution defines the powers and prescribes the jurisdiction of the General Assembly, and it is certain that no such power is expressly granted by that section. Nor do I think such power can be impliedly conferred by necessary implication; for in that section one of the powers delegated to the General Assembly is, "to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrines and order of this church," and it is a canon of construction that the express mention of one thing implies the exclusion of another. Having expressly granted to the General Assembly the power to receive other religious bodies under its jurisdiction, and not having, in equally plain terms, conferred upon it the authority to dissolve the church, and to form a union with another religious society, it seems plain to me that such power was intentionally withheld by the framers of the constitution. But it is insisted that the power may be exercised under the authority to amend conferred by section 60 of the constitution. This argument concedes that no such power existed before; for if the

power was granted by the constitution itself, an amendment for that purpose was not necessary. Moreover, the fallacy of that argument consists in the assumption that the power of amendment confers the right to make such radical and fundamental changes in the constitution as would abrogate it and defeat the purposes for which it was adopted. The power to amend signifies the power to change or alter; but not to destroy. A constitution may be changed or altered to any extent by amendment where the purposes for which the constitution itself was intended are preserved; but the power to amend can never be used as an instrument of destruction of the constitution itself.

To my mind the reasoning of Mr. Justice Hodges, in the case of *Clark* v. *Brown,* (Tex. Civ. App.) 108 S. W. 421, is so clear and logical as to leave no doubt on this point. He said:

"The organization constituted by the church compact being the source from which the delegated power to amend the constitution is derived and for the continuation of which a constitution is to be maintained, the preservation of its integrity was as much a part of the duty imposed, and its destruction as much beyond the power conferred, as if there had been express stipulations to that effect. The word "constitution" signifies something constituted, and is generally used to designate the written evidence of something which can only have a legal existence. It is true that, in exercising the power of amendment, one portion of a constitution may be abrogated and another substituted, and to that extent there may be a partial destruction of the instrument as before existing contemplated in this power of amendment; but there is a clear implication, going with the power to amend, that the integrity of the instrument shall remain unimpaired. If that instrument is to be disregarded, or the powers exercised to be in defiance of its provisions, or by virtue of superior sovereignty, there was no necessity for an amendment. The very fact that powers and duties are to be defined through the instrumentality of an amended constitution carries with it the suggestion that the constitution is to be the source from which the power is to come, and that the government which it creates shall continue to be subject to its requirements. There is in this provision of the constitution requiring the joint acts of the General Assembly and a majority of its presbyteries for its amendment convincing proof of the recog-

nition of this principle, and that the constitution so amended should continue in operation and govern the future management of the church until its provisions had been changed by other and different amendments made in consonance with its purposes and plan of acquisition. When the grant of the power is required to be written into and become a part of the organic law of any institution, whether political, commercial or ecclesiastical, the inference is clear that a continuation of the organic existence constituted is contemplated. If the General Assembly and a majority of the presbyteries had the power to form such union as would result in the destruction of the separate organic existence of the Cumberland Presbyterian denomination, there was no necessity for writing that power first into the constitution before it could be exercised; for by its exercise alone the constitution as amended would be wholly and effectually abandoned. Aside from the power of amendment given in this section, the constitution nowhere undertakes to prescribe the joint duties of the General Assembly and the presbyteries. On the contrary, the powers of each of the different church courts are treated separately, thereby showing an intent to limit the powers of each to such as had been prescribed, and to prevent any enlargement of either except by the consent of the other church courts."

I am, however, of the opinion that the Cumberland Presbyterian Church had the inherent power to form a union with another church. This right is justified upon the same principles upon which, in the first instance, the church was organized. It is a voluntary religious association, and as such it has, under our laws, the same right to dissolve itself and to form a union with another religious society as it had to organize in the beginning. By inherent power is meant "an authority possessed without its being derived from another." The church courts being bodies of delegated powers, it is obvious that they possess no inherent power. It follows that the inherent power to dissolve and to form a union with another religious society rests in the body of the church itself; and, no provision having been made for its exercise, it can only be done by the unanimous consent of the units of the church. If I am correct in my position that the written constitution of the church can not be amended so as to give the church courts the power to dissolve the church and to

form a union with another church, it is equally certain that such courts can not usurp the power reserved in the body of the church to accomplish such purpose. So long as sufficient church units preserve the church organization and are capable of enjoying its ecclesiastical and property rights, I think they are entitled to the use and property belonging to the Cumberland Presbyterian church.

The views I have expressed renders it unnecessary for me to express an opinion on the binding force of the decisions of ecclesiastical courts upon the civil courts; for it is evident that, if the ecclesiastical court has no power to make its decision in the first instance, it can have no binding effect whatever. It is a well established principle of construction that the decision of a court without jurisdiction is void and of no effect.

Mr. Justice WOOD concurs.