OF THE

## STATE OF MISSOURI

AT THE

### OCTOBER TERM, 1914.

*(Continued from Volume 262.)*

HUGH HAYES et al. v. DAVID F. MANNING et al.,
Appellants.

**In Banc, December 31, 1914.**

1. **CHURCH: Constitution: Contract or Compact.** The constitution of a church which is a voluntary association having representative government, is a contract between its members, and is the embodiment of the terms of the compact by virtue of which the church was formed and its powers are to be determined. The members in entering the organization surrender the right of individual action in all matters of general ecclesiastical concern to the judicatories upon which by the constitution they have been conferred.

2. ———: ———: **Power of Union With Other Bodies:. Practical Construction.** The adoption in solemn assembly, on various occasions, repeated' at different times throughout its history, by the highest judicatory of a voluntary church, whose form of government is republican or representative, of resolutions expressing a desire for organic union with other churches of like Gospel faith, in all of which it was assumed, and never disputed, that power to consummate such union existed in said

Hayes v. Manning.

judicatory, is a practical construction of the church's constitution by the body best qualified to know what its organic law means, which under a familiar rule of interpretation will be followed by the courts.

3. ———: ———: **Express Limitation.** A provision in the constitution of a church that "the jurisdiction of the church judicatories is limited by the express provisions of the constitution" is meant to mark the boundaries between the jurisdictions of the various judicatories created by the constitution, so as to prevent the encroachment of one upon the authority conferred upon the others. It does not mean that each judicatory, in the exercise of the general powers conferred, must find in the organic law an express provision authorizing each particular act.

4. ———: ———: **Implied Powers.** There goes along with every express authority conferred by a church's constitution upon one of its judicatories an implied authority to do whatever may be necessary in order to execute the power conferred or to perform the duty imposed.

5. **CHURCH UNION: Power Implied From Express Authority Given.** Although the constitution of the Cumberland Presbyterian Church declared that "the jurisdiction of the church judicatories is limited by the express provisions of the constitution," yet in the powers actually conferred on its General Assembly, namely, that it represents "in one body all the particular churches," and constitutes the bond of union and means by which "the peace of congregations is preserved and mutual confidence is cultivated and encouraged," and possesses power to amend or change the church's confession of faith, catechism, rules of discipline and the constitution itself by the affirmative action of two-thirds of the members of said General Assembly voting thereon, with the subsequent approval upon a referendum of a majority of the presbyteries, is to be found the implied power to do whatever the individual churches and their membership could have done if assembled for that purpose, including the power to effect organic union with another Presbyterian church and to carry with said union to the united or consolidated church all the property of individual churches purchased with unrestricted funds contributed by members of the local congregation.

6. ———: **Consent of Individual Members.** One joining a church whose organization is representative in character and whose constitution designates judicatories empowered to act for the whole organization, surrenders the right of individual action in the control and direction of its affairs, except the right to exercise such powers as its constitution enumerates in the selecting of such representatives, and also agrees to the manner and government of the entire organization as prescribed by

said constitution; and the Cumberland Presbyterian Church was such a voluntary and representative association; and the power existing in its General Assembly to unite the church with another, it was not necessary, in order to make such attempted union effectual and to carry to the united church the church buildings and other property pertaining to local congregations, that the proposition be approved by the affirmative vote of the individual members of the church. Especially is that so where the constitution, either expressly or by necessary implication, lodges such power in the General Assembly and the presbyteries, and a promise is exacted of all persons becoming members that they will abide by and support the rules and regulations of the church while members thereof. The validity of the attempted union was not ·dependent upon the approval or disapproval of individual members, and the alternative of those who disapproved is simply withdrawal.

7. ———: With Larger Church: Change of Name. The provision of section 43 of the constitution of the Cumberland Presbyterian Church that "the General Assembly shall have power to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrine and order of this church; to authorize synods and presbyteries to exercise similar powers in receiving bodies suited to become constituents of those courts and lying within their geographical bodies respectively," not only authorized the General Assembly to perfect a union with a smaller Presbyterian body, but to effect a union of the entire church with a larger Presbyterian church, and to surrender its own name and ecclesiastical organization and to take as its own the name and ecclesiastical organization of such other church.

8. ———: Presbyterian Churches: Power Vested in Its Judicatories. The church courts of a Presbyterian church have all power as to rules of discipline, form of government, change of doctrine, and of the means by which these powers are to be made effectual, except as restricted by its constitution; and if the powers of such courts as exercised by the mother church have been recognized and accepted by a branch or offspring for a long series of· years without a constitution, and then a constitution is framed by its General Assembly and accepted by all its subordinate courts and congregations, a specific and formal amendment thereto is not a measure of the General Assembly's general powers in the constitution expressed, but such general power may be exercised in a reasonable way, and authorizes the adoption of a resolution that the rights, privileges and powers of the members, ministers, courts and subordinate bodies shall henceforth be enjoyed, not separately as before, but in unison and conjunction with another church of similar faith and government, but of different name.

Hayes v. Manning.

9. ————: **Examination of Church Creeds: Incidental to Property Rights.** In determining the legality of an attempted union between churches and the rights to property as between those members of a particular congregation who accept and adhere to the attempted union and those members who dissent and set up claim to the property which has been acquired by funds contributed by its members and conveyed to church trustees for the use of the congregation, with no other restrictions by the donors on the use, the civil courts will not compare the creeds of the two churches attempting to form the union, with a view of determining whether the one or the other have adhered to the faith and doctrine existing prior to the attempted union, and of awarding the property to the dissentients if, as a result of the union, such faith and doctrine have been abandoned; but, in such case, the civil courts will accept the adjudication of the highest ecclesiastical judiciary of the church of which the dissentients were members prior to the union, on questions of creed, faith, doctrine and discipline, in determining whether or not there has been an abandonment thereof by the majority or by the church with which the other unites. [Refusing to follow on this point, Boyles v. Roberts, 222 Mo. 613.]

> *Held*, by GRAVES, J., dissenting, adhering to the rule announced in Boyles v. Roberts, 222 Mo. 613, and the other Missouri cases there cited in support thereof, that civil courts will compare the creeds of two churches attempting to form an organic union, and, where as a result of such comparison it is manifest there has been a departure from and abandonment of the creed of the church which has attempted to unite with the other, award the property to such part of the church as has adhered to the creed of the original church.

10. ————: ————: **Foundation of Rule.** The rule that civil courts will not attempt to review or revise the judgments of the highest church courts as to matters of doctrine, faith, practice, discipline, government and other ecclesiastical matters, even when property rights are incidentally involved, has its foundation in those provisions of the Constitution of the United States and of the State pertaining to religious freedom.

11. **CHURCH PROPERTY: Specific Trust.** Property purchased by funds contributed by members and conveyed to trustees of "the Cumberland Presbyterian Church at Marshall, Missouri," is not impressed with a specific religious trust, but its title is subject to such changes as may be made in the constitution and laws of the entire church by its proper judicatories. Such a trust may be created when property is deeded or donated for the express purpose of inculcating or advancing some particular form of faith or creed; but property purchased by the organization for use as a house of worship or a minister's

residence, and conveyed to church trustees, with no restrictions on its use, is not impressed with such a trust, the presumption in that case being that the property will be devoted to such religious purposes as the governing body shall, under the organic law of the organization, determine. It cannot be held that such property is to be awarded to those who adhere to the faith held when the property was acquired, where the highest judicatory had authority to determine matters of doctrine and faith and has held that there has been no abandonment thereof.

12. **WAIVER AND ESTOPPEL: Distinction.** While waiver is a member of the family of estoppel, estoppel *in pais* has connections in nowise akin to waiver. Waiver is a voluntary surrender of a right, while estoppel is an inhibition to assert a right because of the mischief that has followed; waiver involves knowledge and intention, while estoppel may arise where there is no intention to mislead; waiver depends upon what one himself intends to do, while estoppel depends rather upon what he has led his adversary to do; waiver may effect the other party beneficially, while estoppel results from an act which operates to the injury of the other party; waiver does not imply that one has been misled to his prejudice, while estoppel always involves that element. Waiver may be created by acts or declarations insufficient to create an estoppel.

13. **WAIVER: Church Union: Suit for Local Church Property.** A waiver occurs when one in possession of a right, whether conferred by law or by contract, with full information of the material facts, does or forbears the doing of something inconsistent with the existence of the right or of his intention to rely upon it. So that where the General Assembly of the Cumberland Presbyterian Church formally declared that a union with the Presbyterian Church in the United States has been effected according to the constitution, and one year later the General Assembly adjourned *sine die*, and immediately a minority of its dissenting commissioners formed a separate organization styling itself the "Cumberland Church;" with full knowledge of these facts, the plaintiffs, who as members of the "Cumberland Presbyterian Church at Marshall, Missouri," sue for the church property at Marshall conveyed to trustees of said church prior to said attempted union, not only continued their formal membership with the Marshall church, but participated in all its services, one of them as an elder, and others as officers, continuing to discharge their respective duties as before the union; the relationship of the plaintiffs as officers and members after the union being in nowise different from that of other like officers and members who accepted the union as effectual and binding; and this condition remaining unchanged for more than six months after the union had been

effected, when plaintiffs withdrew from connection and communion with the local church and essayed to organize a separate congregation, and did not institute suit for the property, against trustees who were regularly elected at the stated sessions of the united church, and others who had continued to be members thereof, until nearly three years after such withdrawal, the continued acquiescence of plaintiffs in the union with apparent approval thereof, constituted a complete waiver of any right on their part to said property.

14. ———: **Inertia Coupled with Acquiescence.** Equity does not favor inertia where one in possession of all the facts fails to act; and where there is more than inaction, namely, acquiescence coupled with conduct, which rightly construed means approval, not only once, but by repeated acts for months, a court of conscience will hold that plaintiff has thereby waived his property right.

Appeal from Saline Circuit Court.—*Hon. Samuel Davis*, Judge.

REVERSED AND REMANDED (*with directions*).

*W. M. Williams* and *Virgil V. Huff* for appellants; *Ben Eli Guthrie, John M. Gaut* and *James W. Suddath* of counsel.

(1) The General Assembly of the Cumberland Church was invested by the constitution of the church with supreme legislative, executive and judicial power, and was the highest court of the church, and "represented in one body all the particular churches thereof," and, with the consent of a majority of the presbyteries had the power to form the union with the Presbyterian Church U. S. A., and all the steps required to bring about that union was constitutionally adopted. Beutley v. Ulay, 94 N. E. (Ind.) 759; Harris v. Cosby, 55 So. (Ala.) 231; Carothers v. Mosely, 55 So. (Miss.) 881; Ramsey v. Hicks, 91 N. E. (Ind.) 344; Fussell v. Hail, 84 N. E. (Ill.) 42; Wallace v. Hughes, 115 S. W. (Ky.) 684; Committee of Missions v. Pacific Synod, 106 Pac. (Cal.) 395; Mack v. Kine, 58 S. E. (Ga.) 185; Sanders v. Baggerly, 131 S. W. (Ark.) 49; Brown v.

Clark, 116 S. W. (Tex.) 361; First Presbyterian Church
v. First Cumberland Presbyterian Church, 91 N. E.
(Ill.) 761; First Presbyterian Church v. Cumberland
Presbyterian Church, 126 Pac. (Okla.) 197; Faney
Prairie Congregation v. King, 245 Ill. 120; Pleasant
Grove Congregation v. Riley, 248 Ill. 604; McBride v.
Porter, 17 Iowa, 203; McGinnes v. Watson, 41 Pa. 9;
Watson v. Jones, 13 Wall. 679. ' (2) The General As-
sembly, with the consent of the majority of the presby-
teries, was expressly authorized and empowered by
the constitution to amend, change, and alter the doc-
trinal standards of the church, as well as its constitu-
tion and form of government, and this necessarily car-
ries with it the right and power to enter into said union.
General Assembly v. Overtoun, Scotch Kirk Case, Au-
thorized Report, Macniven & Wallace; Landrith v. Hud-
gins, 120 S. W. 783; Wallace v. Hughes, 115 S. W. 684;
Brown v. Clark, 116 S. W. 360. (3) The Presbyterian
constitution, prior to its adoption by the Cumberland
Church in 1810, had been construed by the Presbyte-
rian churches as authorizing union with other denom-
inations. The Cumberland Church, in adopting that
constitution, took it with the construction previously
placed upon it. State v. Chandler, 132 Mo. 155; Skou-
ten v. Wood, 57 Mo. 380; Collins v. Wilhoit, 35 Mo.
App. 585; Brown v. Walker, 161 U. S. 591. (4) The
Cumberland Presbyterian Church, at the time of its
foundation, and as one of its cardinal principles, de-
clared that it was then and always expected to be
ready and willing for union with the Presbyterian
Church. This declaration was made at the first meet-
ing of Cumberland Presbytery, and reiterated in 1811,
1812, and 1813; afterwards in 1860, 1867, 1873, 1882,
1885, 1888, and 1898, considered the subject of union
with other denominations without any dissent or ques-
tion of the power to enter into such union by any of
its members. The General Assembly in 1898 and be-
fore the present union was contemplated, unanimously

adopted a resolution reciting the provisions of the constitution as to the authority of the General Assembly, and declaring "that proposals for consolidation or for co-operation with other churches are of such nature that they fall within the scope of the Assembly's constitutional power." The construction placed by the church upon its own constitution, like that given by the parties themselves to their own contracts, will be adopted and followed by the civil courts. McGinnis v. Watson, 41 Pa. 9; Smith v. Swormstedt, 16 How. 288; Gibson v. Armstrong, 7 D. Mon. 481; Matthews v. Danahy, 26 Mo. 666; Gas Co. v. St. Louis, 46 Mo. 128; Meyer v. Christopher, 176 Mo. 580; Ogden v. Saunders, 12 Wheat. 290; Stuart v. Laird, 1 Cranch, 296. To refuse to carry into effect the constitution of the church as construed by it, in effect prohibits this denomination from making its own constitution, rules, and regulations, and denies to the defendants, as its representatives, the equal protection of the laws, in violation of their rights under the Fourteenth Amendment of the Federal Constitution. (5) The ministers, elders, and members of the Cumberland Church, upon entering into the organization, expressly agree to submit to and be bound by its rules and regulations, and the decisions and deliverances of its judicatories, and every church, upon its formation, made a similar covenant. This constituted a contract or agreement between the members of the organization. The Cumberland Assembly in May, 1905, assembled at Fresno, California, composed of commissioners from each and every presbytery in *that* church, and confessedly representing the Cumberland Church and before it became a part of the United Church, after canvassing the votes of the presbyteries and announcing the result thereof, did "find and declare that a constitutional majority of the presbyteries of the Cumberland Church has voted approval of the reunion and union of said churches, upon the basis set forth in said joint report, and does find and

declare that said reunion and union has been constitu-
tionally agreed to by the Cumberland Presbyterian
Church, and that said basis of union has for the pur-
poses of the union been constitutionally adopted. This
finding and decision by the General Assembly is con-
clusive and binding upon all the members of said
church. The contract and agreement of the members
to abide by the decisions of the General Assembly and
this decision of the Assembly are especially set up and
pleaded in the answer; and to refuse to give force and
effect thereto will deny to the defendant the equal pro-
tection of the law, in violation of the Fourteenth
Amendment of the Federal Constitution. Boyles v.
Roberts, separate opinion of VALLIANT, C. J., 222 Mo.
695; Watson v. Jones, 13 Wall. 679. (6) Under our
system of government, the church is a free institution,
having all its powers in itself, and deriving them from
no other body or government whatsoever. The pres-
bytery and the General Assembly—identical with it—
were the first and constituting organization of the Cum-
berland Church, who made its constitution and created
its government, and hence under its terms has the sov-
ereign power of the church, composed of citizens of the
United States, and a denial of the power to this body
thus organized and constituted to contract union with
the Presbyterian Church and to direct their property
in connection therewith is an impairment of defend-
ants' rights, immunities and privileges as guaranteed
by the Fourteenth Amendment of the Constitution of
the United States. Watson v. Jones, 13 Wall. 679;
Smith v. Swarmstedt, 16 How. 288; Brundage v. Dear-
dorff, 92 Fed. 214. (7) There was no trust impressed
upon the property in controversy for the propagation
of any specific doctrine. It was conveyed generally to
the trustees for the Cumberland Presbyterian Church
of Marshall, and when the conveyances were made, the
constitution of the church expressly authorized changes
in the doctrines and governmental provisions by the

General Assembly, with the concurrence of a majority of the presbyteries. The General Assembly, after the amendment of the doctrinal standards of the Presbyterian Church, by textual changes, the adoption of new chapters, and the "Declaratory Statement" of the construction to be given to the standards, declared that there was sufficient agreement in the doctrinal standards of the two churches to justify union between them. This declaration was made by each church separately and before the union, and each represented its own membership, who were bound and concluded under the express terms of the constitution thereby; and the civil courts will not undertake to compare the creeds of the churches, but will permit them to make their own doctrinal statements in their own way. Watson v. Jones, 13 Wall. 679; Brundage v. Deardorff, 92 Fed. 214. (8) Plaintiffs in this case remained in the church; participated with the original congregation in all of its services; took part in its activities—one being an elder, and several others being officers, who attended to their respective duties and took part in the church deliberations—and continued their membership just as they had before for a long time after the union was consummated and carried into effect, with full knowledge on their part of all the steps taken to bring about said union. The declaration of the General Assembly that the union had been constitutionally adopted was made in May, 1905, and in May, 1906, the General Assembly adjourned as a separate body, the minority of dissenting commissioners forming a separate organization at that time. The pastor and session of the Marshall church, with full knowledge of the plaintiffs, submitted to the jurisdiction of the General Assembly, and conducted the affairs of the congregation as a part of the united church. Notwithstanding the organization was formed by the dissenting commissioners in May, 1906, there was no withdrawal from the congregation by the plaintiffs until December 13, 1906, when they left de-

fendants in possession of the church property sued for, and they did not organize a separate congregation until March 29, 1907, and did not bring this suit until November 4, 1909. Plaintiffs, by their acquiescence, delay and waiver of any rights they might have had, are not in a position to ask affirmative aid by a court of equity. Vargo v. Varjo, 73 Atl. 649; Kipp v. Miller, 108 Pac. 164; Henderson v. Koenig, 192 Mo. 714; Williams v. Railroad, 153 Mo. 519; Fulkerson v. Lynn, 64 Mo. App. 653; 40 Cyc. 252; Peabody v. Flint, 88 Mass. 52. (9) Plaintiffs claim their right by allegiance to the minority of the commissioners who dissented at Decatur in 1906 and formed a separate Assembly, and are hence estopped by any facts which would operate as an estoppel upon said commissioners. The commissioners representing those opposed to the union at Fresno in 1905 invoked the jurisdiction of that General Assembly by filing a protest, objection to the union upon the grounds of disagreement in doctrine between the two churches and of lack of constitutional authority in the General Assembly to act in the premises, thereby submitting themselves and those questions to the jurisdiction of the General Assembly; whereupon said General Assembly adjudicated both questions against said commissioners. Likewise at Decatur in 1906, they again invoked the jurisdiction of the General Assembly to decide said question, and the General Assembly again decided them against said commissioners. Having recognized the jurisdiction of the General Assembly to decide said questions and the General Assembly having decided the same at their instance, these plaintiffs are now estopped from raising said questions in another tribunal. Martin v. Evans, 85 Md. 8, 60 Am. St. 292; Mfg. Co. v. Garland, 124 U. S. 81. (10) Plaintiffs admit that they left the congregation, the church building, and the church organization, where they were formerly associated with the defendants. Such action on their part amounts to surrender of their interest in

the property of the local church, even though they continued to adhere to the doctrines of the organization to which it was formerly attached. Mack v. Kime, 58 S. E. 194; Godfrey v. Walker, 42 Ga. 561; Watson v. Garvin, 54 Mo. 374.

*Reynolds & James, W. C. Caldwell* and *D. D. Duggins* for respondents.

(1) Confessedly the property involved in this litigation was conveyed in trust for the use and benefit of the Cumberland Presbyterian Church at Marshall, Missouri, of which the plaintiffs and those for whom they sue are the only present persisting members. (2) The Cumberland Presbyterian Church is but an unincorporated voluntary society, for religious purposes. Its written constitution is the contract of the association or society. It is binding upon all portions of the church, including the executive, legislative and judicial bodies and agencies thereof, as well as the membership. The constitution is the supreme law of the church, and must be adhered to by every part thereof. Boyles v. Roberts, 222 Mo. 613. (3) The defendants and those for whom they are sued, as members of the Presbyterian Church U. S. A., at Marshall, Missouri, have and claim no interest in that property, except by and through the so-called union between the Cumberland Presbyterian Church at large and the Presbyterian Church U S. A. at large. This is also confessed. (4) The so-called union was unconstitutional, *ultra vires* and void. This court passed upon this exact same union in the case of Boyles v. Roberts, 222 Mo. 613, and its legal status in Missouri has therefore been definitely settled. (5) The decision in the case of Boyles v. Roberts, 222 Mo. 613, is sound in reason and in law. It is just, and vindicates itself. To overrule that decision and accept the declaration of the General Assembly of the Cumberland Presbyterian Church,

that the so-called union was "constitutionally adopted" and is in full "force and effect," as conclusive on this court in this case as appellants seek and ask, would be to overrule also a long line of previous decisions of this court, including Watson v. Garvin, 54 Mo. 337; Prickett v. Wells, 117 Mo. 504; Russie v. Brazzelle, 128 Mo. 113, and Fulbright v. Higginbotham, 133 Mo. 677, in which this court of itself and upon its own independent judgment considered and construed and applied the church constitution and creed, and adjudged civil rights accordingly. All of the courts holding the so-called union valid, with perhaps one or two exceptions, have accepted and treated the ecclesiastical edict or declaration as conclusive on them; and in so doing they have put themselves in conflict with the several Missouri decisions just mentioned, and in a position of subserviency which, in our humble judgment, no civil court should acknowledge or permit, and which this court, in recognition of its obligation and responsibility under the Constitution of the State has in numerous instances refused to acknowledge or permit. (6) The appellants plead in their answer in various counts, that plaintiffs or respondents are estopped from their contentions in this cause, by reason of the premises, thus undertaking to validate the void proceedings had in the church courts. The alleged proceedings for union or merger, being void, furnish no basis for estoppel. The law of estoppel is embraced under three heads, first, by record—legislative or judicial; second, by deed; third, by matters in pais. As judicial proceedings, the proceedings in question are void for want of jurisdiction of the subject-matter. Boyles v. Roberts, 222 Mo. 613. As administrative or legislative proceedings, they are not only in excess of authority of the administrative or legislative agency, but are beyond and outside the purposes of the creation of the church and of such agencies; they are prohibited by and in violation of the constitution of the church and are un-

constitutional, *ultra vires* and void, and therefore bind no one and no one can be estopped thereby. Boyles v. Roberts, 222 Mo. 613. With the proceedings and contract of union void and out of consideration, there is nothing left in the facts of the case upon which an estoppel *in pais* can be founded. Wood v. Kansas City, 162 Mo. 309; Boyles v. Roberts, 222 Mo. 613. The basis of an estoppel *in pais* is misrepresentation or fraud, and by reason of which a change of position has been brought about by the party invoking the estoppel, and by which such party has been damaged. This arises either from contract or from the voluntary act or conduct from which a contract is implied. Bigelow on Estoppel (5 Ed.), p. 556. Estoppel *in pais* arises from the voluntary conduct of a party, and whereby he is absolutely precluded, both in law and equity, from asserting rights which might otherwise have existed— either of property or contract, or of remedy against another person, who in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquired some corresponding right. Bowles v. Bennington, 136 Mo. 522; DeBerry v. Wheeler, 128 Mo. 90; Johnson-Brinkman Co. v. Railroad, 116 Mo. 573; Guffey v. Riley, 88 Mo. 418; Bigelow on Estoppel (5 Ed.), p. 453. Estoppel *in pais* must embrace all of the following elements: 1st, There must have been a false representation or a concealment of material facts; 2d, The representation must have been with knowledge, actual or virtual, of all the parties; 3d, The party to whom it was made must have been ignorant of the truth of the matter; 4th, It must have been made with the intention that the other party should act upon it; 5th, The other party must have been induced to act upon it to his damage. Bigelow's Estoppel (5 Ed.), p. 570; DeBerry v. Wheeler, 128 Mo. 90. The statement must have been as to the existence or non-existence of certain facts and not to a mere expression of opinion. Bigelow's Estoppel (5 Ed.), p.

572. Again, in effect, it must have been a contract or agreement as to the truth of a certain status. Bigelow, supra. Again, it must have been with reference to some some fact known or having existed and not with reference to the future. Bigelow, supra, 574. Again, it must have been plain and certain. Bigelow, supra, 578. Again, it must have been free and voluntary, and it must have been obtained without artifice, duress or fraud. Bigelow, supra, 578; German Institute v. Jacoby, 97 Mo. 624; Gray v. Gray, 83 Mo. 106. Again, it must have been such as to have led a man of prudence to act upon it. Bigelow on Estoppel, p. 572; Bales v. Bennington, 136 Mo. 530. In order to create an estoppel *in pais* a party pleading it must have been misled to his injury, must have suffered loss of a substantial character, or have been induced to alter his position for the worse in some material respect. Wiggins v. Ferry Co., 88 Mo. 615; Blodgett v. Perry, 97 Mo. 263. An estoppel *in pais* is never allowed to be used as an instrument of injustice or fraud, but only to prevent injustice and fraud, and it is therefore essential that the party claiming the benefit of the estoppel must have proceeded in good faith. Garesche v. Levering, 146 Mo. 436; Gray v. Gray, 83 Mo. 106; Campbell v. Hoff, 129 Mo. 317. Coercion has no place in the law, and especially none in the law of estoppel. Present one, absent the other. The basis for estoppel must be the result of free and voluntary action and must not be the result of imposition or coercion. Bigelow on Estoppel (5 Ed.), p. 563. Acquiescence is a branch of the law of estoppel, and is governed by the same principles. Schuerich v. Light Co., 109 Mo. App. 428; 40 Cyc. 258. So also is waiver. 40 Cyc. 258. Neither can be based upon an involuntary situation or dilemma. 40 Cyc. 29; Bonham v. Harris, 125 Tenn. 454. One cannot be said to have waived a right by his conduct, unless he was in a position to have enforced the same by his conduct, and voluntarily yielded the

point, and voluntarily accepted a situation at variance
therewith. 40 Cyc. 258. The appellants in their brief
speak loudly of waiver upon the part of appellants, but
it will be noted that in their answer and pleadings
herein in the court below, they never spoke of waiver,
and only pleaded estoppel—and can therefore now only
insist upon such waiver as is naturally included in the
term estoppel. Neither estoppel nor waiver can be
properly predicated upon a situation such as the evi-
dence in this case shows the plaintiffs or respondents
were thrown into by the conduct of the appellants and
those with whom appellants acted in concert. It was
not a voluntary situation, but an involuntary one. Bon-
ham v. Harris, 125 Tenn. 454. Again: The plaintiffs
were not required to take any notice whatever of the
action of the General Assembly in declaring the union
in force. The contract of union and all proceedings
leading up thereto being *ultra vires* and void (not only
so at the time of its inception and promulgation, but
equally so at all times thereafter), had no binding force
and effect whatever; it was the same as if no action
had been taken by the General Assembly at other church
courts. Plaintiffs were not affected thereby and were
under no duty whatever to act as if they thought the
same was valid or take steps to avoid the same. The
contention of defendants to the contrary is not well
taken. Wood v. Kansas City, 162 Mo. 310; Boyles
v. Roberts, 222 Mo. 613. The action of the Assembly
was void, and there was therefore no enforced accept-
ance of the union and transfer. There was no volun-
tary acceptance of it by plaintiffs. Not only that, but
no acceptance of or allegiance to the union was required
by defendants prior to December 13, 1906; on the con-
trary it was expressly provided, as late as the said
13th day of December, 1906, that such was not required
in order to remain and be a member of the congrega-
tion. The session, a majority of which are defendants
herein, and the moderator thereof or pastor of the

church, held a meeting just prior to the convocation of the congregational meeting and adopted a resolution and spread the same upon the minutes of their official proceedings, and in which it was provided: "That no acceptance of or allegiance to the union or reunited church would be required of any member in order to entitle him to participate and vote in said meeting." In the face of such a resolution the contentions of defendants in this cause assume a phantom form. If there is any estoppel to be found in the record, it is that they themselves are estopped from making any contention advanced herein. (7) Aside from all else, a plea in estoppel is but a plea of confession and avoidance. The defendants by making the same admit the rights of plaintiffs. (8) The plaintiffs did nothing by way of acquiescence or otherwise to deprive themselves of their rights as persisting Cumberland Presbyterians, or to confer any rights on the defendants as members of the Presbyterian Church U. S. A. 1st. There was nothing the plaintiffs could do by which the void scheme of union would be made valid, and thereby the property passed out of the Cumberland Church into the Presbyterian Church U. S. A. and nothing that they did do, by which they are now precluded from asserting the invalidity of said scheme. 2d. It was well known from the time of the alleged consummation of the so-called union on May 24, 1906, that the plaintiffs and their associates still adhered to the Cumberland Presbyterian Church, notwithstanding the fact that they and the defendants went on together in the use and occupation of this property until December 13, 1906. 3d. The defendants made no public claim that they were members of the Presbyterian Church U. S. A., and did not as such assert ownership of this property until December 13, 1906. 4th. It was not essential to the preservation of the rights of the plaintiffs, as persisting members of the Cumberland Pres-

byterian Church at Marshall, that they should cease
their attendance upon the services in this house of wor-
ship sooner than the 13th of December, 1906, or at all.
Wood v. Kansas City, 162 Mo. 303; Bonham v. Harris,
125 Tenn. 454. 5th. Even if the plaintiff Hugh Hayes,
by any action on his part in reference to the so-called
union, had cut himself off from asserting an interest
in this property as a persisting Cumberland Presby-
terian (and he did not), that would not preclude the
other plaintiffs from maintaining this suit. For, the
so-called union being void, nothing short of unanimous
consent on the part of the entire membership of the
Cumberland Presbyterian Church at Marshall would
suffice to pass this property into the Presbyterian
Church U. S. A. Bonham v. Harris, 125 Tenn. 454.
6th. There was no organization of a new church at
Marshall; but only a continuation of the old one, for
whose use and benefit the property was conveyed.
There was no abandonment of the property by the
plaintiffs to the defendant. The plaintiffs, to preserve
the peace and prevent physical strife, though asserting
their rights to the property as persisting members of
the Cumberland Presbyterian Church, simply made
temporary arrangements for a hall in which to wor-
ship, pending the decision of the courts as to the va-
lidity of the so-called union. And soon after the de-
cision in Boyles v. Roberts, 222 Mo. 613, the defend-
ants still refusing to surrender the property, this suit
was brought. (9) No right of the defendants under the
Fourteenth Amendment was violated by the decision
of this court in the case just mentioned. The court in
that case simply decided that the so-called union, un-
der which alone these defendants claim this property,
was invalid for the reasons stated, and ineffective to
pass the property of the Cumberland Presbyterian
Church into the Presbyterian Church U. S. A. That
decision leaves the property here in question where the
deeds placed it, as must have been true then and must

be true now if the so-called union is invalid and ineffective.   Therefore the decision takes nothing from the defendants, impairs none of their legal rights.  Under that decision and under the universal rule of law applicable in such a case, the defendants have ceased to have any interest in this property by going out of the Cumberland Presbyterian Church, for whose use and benefit the trust was created, just as members of any other church would cease to have an interest in its property by a cessation of the membership in that church.

WALKER, J.—Plaintiffs as officers and members of a Cumberland Presbyterian Church (hereinafter referred to as the Cumberland Church) bring this suit to have reduced to their possession certain property in the city of Marshall, consisting of several lots of ground on which are located a church building, a manse or pastor's residence, and a mission church.  Plaintiffs, by reason of the alleged relation they sustain to the church, claim to be the equitable owners of the property, holding same in trust for the church, and that defendants wrongfully withhold same from them. Whereupon they ask a decree for the possession of the property, and that defendants be enjoined from further interfering with their right to the possession and use of same, and that the injunction be made perpetual. Defendants deny the equitable ownership of plaintiffs in the property, or that they are entitled to its possession, but allege that it is the property of the "Presbyterian Church in the United States" (hereinafter referred to as the Presbyterian Church), the only legal successor of the Cumberland Church, as a result of a union of said churches, and deny that they have refused to permit plaintiffs to use and occupy any part of the property.  The reply was a general denial.

Upon a hearing a decree was rendered in plaintiffs' favor, and defendants were enjoined and re-

strained from the further use of the property. After the usual procedure they appealed to this court.

The Presbyterian and Cumberland churches have practically the same form of government, which is representative or republican, as contradistinguished from religious organizations which are either monarchial in form and governed by a hierarchy, or are pure democracies in which each particular church is a separate entity whose affairs are regulated wholly by its members.

Under the form of government of the churches here involved, a local congregation is called a particular church, which is immediately governed by a church session composed of the minister in charge and the ruling elders elected for terms fixed by the congregation.

Next in order is the presbytery, which embraces a number of particular churches within a prescribed district. The powers of a presbytery are exercised by the ordained ministers in the district and one ruling elder from each particular church therein. Superior in authority to the presbytery is the synod, which embraces not less than three presbyteries and consists of ministers and ruling elders from each particular church. The General Assembly is the highest authority of the church. It is a representative body composed of ministers and ruling elders selected by and from each of the presbyteries.

The conflicting claims of the parties to the property in question grew out of a union between the Presbyterian and Cumberland Churches, claimed by defendants to have been consummated by the joint action of the General Assemblies of said churches in 1906. For a number of years prior thereto the propriety of a union was discussed generally by the members of the respective church organizations; since said union its validity has been challenged by members of the Cumberland Church, and suits have been brought by them

in different jurisdictions in State and Federal courts to determine the question.

The Cumberland Church sprang out of the Presbyterian Church. Early in the nineteenth century, about 1804 or 1805, a controversy arose between certain officers and members of the Presbyterian Church, the creed of which is termed the Westminster Confession of Faith. This controversy, omitting minor matters, centered principally upon differences of opinion in regard to the doctrine of predestination. This controversy gained strength and became more widespread from year to year as the individual ministers and members of the different churches acquired more liberty of thought, as has always been the case in the history of every formulated belief prepared by one set of men for adoption by others, since the abandonment of the simple faith of the primitive Christians and the promulgation of the first creed at the council of Nicea, until 1810 when three ministers of the Presbyterian Church in the State of Tennessee emphasized their opposition to the established order and by an open breach laid the foundation upon which was built the Cumberland Church. In 1813 the church thus founded established three presbyteries; a synod was also formed, which set forth the propositions upon which the Cumberland Church differed from the Westminster Confession of Faith.

In 1829 a General Assembly of the Cumberland Church was established. In 1883 this church promulgated a constitution, and at the meeting of its General Assembly in 1906 it had grown in strength until it had a membership of 185,212, represented by 2869 congregations, 1514 ordained ministers, 114 presbyteries, and 17 synods.

In 1903 the Presbyterian Church revised its Confession of Faith in such a manner that the essential differences in doctrine between it and the Cumberland Church, which had wrought the disruption in 1804 and

1805 and had led to the establishment of the latter church in 1810, were so far eliminated, as we measure the meanings of their respective creeds and constitutions by comparison and contrast, as to bring the two churches into substantial harmony, thus removing any reasons theretofore existing against reunion. Following the revision of the Confession of Faith by the Presbyterian Church, in 1903 the General Assemblies of the Presbyterian and Cumberland churches at their respective meetings in that year appointed committees to negotiate a union between said churches. These committees agreed upon terms and united in a report embodying same, which was to the effect that there was no material difference in the articles of faith of the two churches, and a reunion was, therefore, recommended; this report was submitted to the General Assemblies of the respective churches in May, 1904, and was adopted by each of said Assemblies by the required majority, the vote of the Cumberland Assembly being one hundred and sixty-two in favor of the union to seventy-four against same. Each Assembly thereupon referred the basis of union to its presbyteries, and it was approved by a large majority of the presbyteries of the Presbyterian Church and by those of the Cumberland Church by a vote of sixty in favor of the union to fifty-one against it, one presbytery approving conditionally and two not voting. The terms of the joint report provided that the union should have binding force when approved by the General Assemblies and presbyteries of the two churches.

The vote of the presbyteries was taken and reported to the General Assemblies of the two churches in 1905, and upon being formally canvassed the result was declared in favor of the union. At the time of the meeting of the General Assembly of the Cumberland Church at which the vote of the presbyteries was reported, there was no division in the church organization or dispute as to the supreme authority of the Gen-

eral Assembly, as is evidenced by each presbytery vot-
ing upon the basis of union and reporting the result to
the Assembly.

In May, 1906, at a meeting of the General Assem-
bly of the Cumberland Church at Decatur, Illinois, the
report of the committee which had been canvassed at
the meeting of the General Assembly of this church at
Fresno, California, in the preceding year, was adopted
and it was then formally declared that the union be-
tween the Cumberland and the Presbyterian Churches
had been established, whereupon the General Assem-
bly of the Cumberland Church adjourned *sine die*.  A
minority opposed to the union immediately thereafter
met in Decatur, and, after a formal organization,
adopted resolutions to rescind the action of the Gen-.
eral Assembly which had then adjourned.

This meeting then adjourned to meet one year
later in the State of Tennessee, at the place where the
Cumberland Church had been founded.  It was claimed
by the minority that it was the lawfully constituted
Generally Assembly of the Cumberland Church, and its
successors have since that time held annual meetings
and now claim to represent a church membership of
100,000.

The storm center of the controversy here is in the
Marshall congregation.  It was originally organized
as a Cumberland Presbyterian Church, and was re-
ceived into a presbytery of that denomination within
whose bounds it was located, which presbytery was in
allegiance with the proper synod, and the latter bore
a like relation to the General Assembly.  The property
in dispute was purchased, so far as the record dis-
closes, with funds furnished by the members of the
congregation, and was conveyed to the trustees of the
Cumberland Presbyterian Church of Marshall, Mis-
souri.  The pastor of the Marshall congregation, while
the basis of union was under consideration, was the
stated clerk of the Cumberland General Assembly, and

was secretary of the committee of the union of which he was an active advocate. The members of the congregation had knowledge of this fact. It was his practice upon his return from the General Assembly, the synod or the presbytery, to report the proceedings to the church session and the congregation. The session of the Marshall church at no time failed to recognize the authority of the General Assembly in the various steps taken in relation to the union, and raised no question as to its jurisdiction or power. Delegates were from time to time sent from this church to the presbytery and synod, which judicatories were, during all of this time, advocating the union. After the union was declared constitutionally adopted by the General Assembly at Fresno, California, in 1905, the session of the Marshall church, by its acquiescence recognized the validity of this proceeding, and the absence of any antagonistic action indicated that the congregation understood that the session intended to abide by the same. The plaintiff Hayes was an elder and a member of the church session during the entire four years the union was under consideration, and at the time of its consummation in 1906, instead of dissenting, he took part, as did other members, in the church session, and acquiesced in whatever action was taken.

After the final adjournment of the Cumberland General Assembly in May, 1906, the plaintiffs retained their membership in the Marshall church, and participated in its services. The plaintiff Hayes in addition to his membership in the session, and his acquiescence in the action of the church, continued to act as assistant superintendent of the Sunday School conducted under the auspices of the church, and neither he nor any of the other members of the church manifested any dissent until the meeting of December 13, 1906, when an election of church officers was to take place. Plaintiff with other members of the congregation then withdrew therefrom and left the defendants in possession

of the buildings and property now sued for. In March, 1907, the dissentients organized a congregation under the jurisdiction of the Assembly, which had been attempted to be formed in Decatur after the adjournment of the regular Cumberland Assembly. This was ten months or more after the union had been consummated, and more than three months after the withdrawal of plaintiffs from the congregation and their leaving the defendants in possession. So much for the local coloring given by the facts to this controversy.

To a proper understanding of the merits it is not amiss to give in substance such portions of the organic law of the Cumberland Church as we deem relevant to the questions here involved:

"25. The church session exercises jurisdiction over a single church; the presbytery, over what is common to the ministers, church sessions, and churches within a prescribed district; the synod, over what belongs in common to three or more presbyteries, and their ministers, church sessions, and churches; and the General Assembly, over such matters as concern the whole church; and the jurisdiction of these courts is limited by the express provisions of the constitution. Although each court exercises exclusive original jurisdiction over all matters specially belonging to it, the lower courts are subject to review and control of the higher courts in regular gradation.

"40. The General Assembly is the highest court of this church, and represents in one body all the particular churches thereof. It bears the title of the General Assembly of the Cumberland Presbyterian Church, and constitutes the bond of union, peace, correspondence, and mutual confidence among all its churches and courts. . . . It shall meet as often as once every two years . . . and shall consist of commissioners from the presbyteries.

"43. The General Assembly shall have the power to receive and decide all appeals, references and com-

plaints regularly brought before it from the inferior courts; to hear testimony against error in doctrine and immorality in practice, injuriously affecting the church; to decide in all controversies respecting doctrine and discipline. . . . To receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrine and order of this church.

"60. Upon the recommendation of the General Assembly, at a stated meeting, by a two-thirds vote of the members thereof, the confession of faith, catechism, constitution, and rules of discipline, may be amended or changed when a majority of the presbyteries, upon the same being transmitted for their action, shall approve thereof.

"111. It is a prerogative of these courts, ministerially, to determine controversies of faith and questions of morals, to set down rules and directions for the better ordering of the public worship of God and government of His church, . . . and authoritatively to determine the same, which determinations are to be received with reverence and submission."

I. The material issue here is as to the right of the General Assembly of the Cumberland Church to unite with the Presbyterian Church. If the right existed, then the possession of the property involved should be restored to appellants; if the power to unite was lacking, then the judgment of the trial court awarding the possession of the property to the respondents was correct.

**Church Union.**

Concretely stated, the attitude of the parties is that respondents deny the legality of the steps leading to the union, from which it follows that it has not, therefore, been lawfully consummated. They claim that they constitute the true Cumberland Church, and as such are entitled to all of the property belonging to that body before the union; that appellants have abandoned the ancient church and faith, and have caused

themselves to be absorbed by another and a different religious organization, and so having done they have no legal interest in or title to the property. Appellants contend on the contrary that the union having been authorized by a two-third's vote of the General Assembly, the highest judicatory of the church, and approved by a majority of the presbyteries, in conformity with the requirements of the constitution, the union became an established fact.

It cannot but be helpful in elucidating the question under consideration to ascertain what the attitude of the Cumberland Church has been in regard to a union with the mother church, from the time the former sprang from the loins of the latter, down to the consummation of the union in 1903.

At the first meeting of the Cumberland presbytery formed at the time of the foundation of this church in 1810, a circular letter was framed and issued, expressing in no uncertain terms a wish and desire to reunite with the Presbyterian Church whenever it could be done on gospel principles. This feeling was reiterated at the meeting in 1811. In 1812 this declaration was made: "That this Presbytery has always been, and expects to be, ready and willing for union with the general Presbyterian Church on Gospel principles." In a resolution adopted by the Cumberland Presbytery in 1813 it was recited that "this Presbytery has made every reasonable effort to be reunited to the General Presbyterian Church."

At the meeting of the General Assembly of the Cumberland Church in 1860 a resolution was adopted affirming the readiness of the church "to reciprocate fraternal feelings with all Christians, but expressing more especially a desire for union with the great Presbyterian family, and to see all the branches thereof represented in one General Assembly." In 1867 the Cumberland General Assembly negotiated with the Southern Presbyterian Church for a union there-

with, and to that end without a protest or dissent, committees were appointed to formulate plans looking to the union. It failed, however, not because any questions arose as to a lack of power, but because the Southern Church was unwilling to agree to the proposed modifications of the doctrinal statement. In 1873 an attempt was made to unite with the Presbyterian Church U. S. A. The lack of authority of the General Assembly in this regard was in no way intimated. In 1882 proceedings were begun for union with the Evangelical Reform Church, which was not consummated, but not on account of any question as to the power of the General Assembly. In 1885 a proposition was under consideration for a union with the Methodist Protestant Church; it was not effected, but no one asserted a lack of power in the Cumberland Church to so unite through the instrumentality of its General Assembly. In 1898 a judiciary committee of the General Assembly of the Cumberland Church proposed unions with other denominations as follows: "All schemes and proposals for consolidation or for church co-operation with other churches are of such nature that they fall within the scope of the Assembly's constitutional power; therefore, resolved, that no such proposals should be made to other churches by any part of this church, nor, if made by other churches, or part thereof, should they be publicly considered by any part of this church, until after the General Assembly shall have properly authorized such proceedings." These unopposed instances on the part of the church, indicative of a desire and purpose to unite with other organizations of like faith, are supported by precedents from the history of the Presbyterian Church, which, with a similar constitution, has always held it possessed the inherent power to unite with other churches, and has not infrequently exercised same. The union of the Old and New School churches in 1869, that of the Reformed Synod of the South, with the Southern

Church, during the Civil War between the States, and the uniting of the Southern Church in the seventies with the Presbyterian Church U. S. A. are illustrations of the exercise of this power in the absence of express authority therefor in the constitution. Illustrations of this tenor extending over a period of ninety years are ample evidence that the church's highest judicatory was at all times seeking union with religious organizations of similar faith. The absence of protest against these repeated efforts towards union of which the membership had notice, is proof that they met with general approval. These efforts cannot be construed other than as an interpretation of the power given by the constitution in this regard. The Cumberland Church is a voluntary association and its constitution is in the nature of a contract between its members.

Church's Constitution: Practical Construction. This is true of any religious organization which owes its existence to a compact between its members, and, if it has adopted a constitution, it is the embodiment of the terms of the compact by virtue of which it was formed and under which it is to be conducted. [Bear v. Heasley, 98 Mich. 279.] The members in entering the organization, therefore, surrender the right of individual action in church matters except in the "particular churches," and confer whatever power they otherwise possess upon the different judicatories in their order, the General Assembly, as we have shown, being the highest and having not only executive but legislative and judicial power as well; thus panoplied it has interpreted its constitution as conferring power upon the Assembly to not only inaugurate but to consummate a union with another organization. This is a practical construction made by a representative body of the church best qualified to know what the organic law means, and under a familiar rule of interpretation will be followed by the

courts. [Wallace v. Hughes, 131 Ky. l. c. 470; First Pres. Ch. of Louisville v. Wilson, 14 Bush, 252.]

II. Despite this long continued construction of the constitution given by the church's highest judicatory and the approval of this construction by the individual membership, it is claimed, in the absence of express words, that no power exists Church Union: in the constitution authorizing the Express and Implied union of the church with another or-Constitutional ganization. This contention is based Authority. on the language of section 25, supra, which provides in effect that "the jurisdiction of the church judicatories is limited by the express provisions of the constitution." The individual members are not authorized to participate in the government of the church except that they may select the ruling elders in their respective congregations. The power of the church is conferred on the four courts we have enumerated, and under said section 25 their power is distributed as therein indicated. Instead, therefore, of the limitation above quoted applying unqualifiedly to the constitution, its effect is simply to mark the boundaries between the jurisdictions of these courts so as to prevent the encroachment of one upon the authority conferred upon the other. To illustrate, the authority of the church session is limited to one church, while the jurisdiction of the General Assembly extends over the entire church as an organization. The limitations, therefore, of the language in question apply only to the General Assembly should it attempt to exercise jurisdiction over a particular church except by appeal. We would not be understood as holding, however, that the words quoted from said section 25 have no other effect than to define the scope of power of the different church courts in relation to each other, but that each must find in the constitution authority for the performance of their several acts; but this con-

struction does not require that a court in the exercise
of its powers must find in the organic law an express
provision authorizing each particular act; this would
have the effect to exclude all implied authority or in-
herent power which courts of the character of these
judicatories possess by reason of their organization
and to enable them to exercise the duties imposed on
them.   An implication of authority to do whatever may
be necessary to be done or to execute a power con-
ferred or perform a duty imposed, always follows a
grant of specific power or the imposition of a definite
duty upon a person or a court.   [State ex rel. v. As-
surance Co., 251 Mo. l. c. 301; Shull v. Boyd, 251 Mo.
452; State ex rel. v. Laclede Gaslight Co., 102 Mo.
472; State ex rel. v. Board of Eq., 108 Mo. l. c. 242;
McKay v. Minner, 154 Mo. l. c. 612; Trout v. Livery
& Undertaking Co., 148 Mo. App. l. c. 637; Sutherland,
Stat. Con., sec. 334.] Under the foregoing elementary
rule it follows that if any duty was imposed by the con-
stitution upon the General Assembly, or authority was
thereby conferred upon it which required or authoriz-
ed union with another organization, then the authori-
ty had its basis in the express provision which imposed
the duty or conferred the power from which the im-
plication arose.   As we have stated, the General As-
sembly was the highest court of the church, it was em-
powered to pass all necessary laws, rules and regula-
tions for the whole church; it could dissolve any of the
other judicatories in the enforcement of discipline.
It is expressly declared in the constitution that it rep-
resents "in one body all of the particular churches
thereof" and constitutes the bond of union and the
means by which "the peace of congregations is pre-
served and mutual confidence cultivated and encourag-
ed."   It would be difficult to conceive of a more ample
expression of authority conferred or duty imposed than
is to be found in the foregoing language; from it the
conclusion is authorized that the General Assembly

is "the embodiment and expression of the sovereign power of the whole church," not only as represented by its subordinate judicatories, but by its individual membership, "and that it could do for the churches and for the membership whatever they could have done if they had been assembled for that purpose." [Brown v. Clark, 102 Tex. 1. c. 333.] Further than this it provides that the Confession of Faith, catechism, rules of discipline and the constitution itself may be amended or changed by the affirmative action of two-thirds of the members of the General Assembly voting thereon, with the consequent approval of a majority of the presbyteries, in the same manner in which the question of union was submitted in this case.

We should not lose sight of the fact that the constitution and rules of discipline are practically all there is of church government and organization, and the right to change these includes as a necessary consequence the power to adopt either a new constitution or rules of discipline, or to change the form of government of the church or any of its established features or institutions, proper regard being had in the exercise of any of these powers that the distinctive doctrines of the church are not ignored or sought to be abrogated. [Com. of Missions v. Pacific Synod, 157 Cal. 105, 121.]

III. But it is contended if power exists in the General Assembly to unite the church with another organization, it cannot become effectual in the absence of the affirmative vote therefor of a majority of the individual members of the church, and it not appearing that such majority ever consented to the union, it has never been legally consummated. This contention is based on the assumption that the sovereign power of the church vests in the individual members, and although the presbyteries and General Assembly have

Church Union: Consent of Individual Members.

been clothed with power to change matters of procedure and the internal organization of the church, yet these bodies have not been authorized to adopt measures to effectuate the union of the church with another church which would efface the church's entity and cause it to take a name descriptive of another and a different organization.

One joining an organized society such as a church having a representative form of government under the supervision and control of judicatories known as church courts, agrees by the act of membership to abide by the rules, orders and judgments of such courts properly made, and consents that whatever rights and privileges he may possess as a member shall be controlled by such rules, orders and judgments. A Cumberland church is an organization representative in character, its actions are directed and controlled by the judicatories we have designated; one joining such a church, therefore, surrenders the right of individual action in its affairs except as authorized in the selection of deacons and elders in a particular church, and agrees to the manner and form of government of the entire organization. His formal vote and those of his associate members are consequently not necessary to validate any powers which have been conferred by the constitution by express terms and necessary implication upon the General Assembly and the presbyteries. Especially is this true in the Cumberland Church in which the promise is exacted from persons joining same that they will abide by and support the rules and regulations of the church while members thereof.

In view of the relation above defined which the individual bears to the Church, it follows that the powers granted to the General Assembly and presbyteries when exercised by them are binding upon all of the members regardless of whether the action meets with their ap-

263M o3

proval or not; the alternative of those who disapprove is simply withdrawal from the organization, for the fact of membership implies an agreement to abide by the actions of the governing body. [Watson v. Jones, 13 Wall. 679; Lamb v. Cain, 129 Ind. l. c. 513; Mack v. Kime, 129 Ga. l. c. 17; White Lick Quar. Meeting v. White Lick Quar. Meeting, 89 Ind. l. c. 151; Bear v. Heasley, 98 Mich. 279.]

This being true, it follows as a necessary consequence that the individual members of the Cumberland Church are bound by the action of its General Assembly and presbyteries in effecting the union unless authority to make it has been withheld by express inhibition from these judicatories which are otherwise admitted to be clothed with absolute power in directing the affairs of the church.

IV. There is no provision in the constitution prohibiting union by the Cumberland Church with another whose faith is in harmony with its own; on the contrary, in addition to the inherent power implication of the right to union in er we have referred to, there is a clear section 60, supra, which, as we have seen, provides that the Confession of Faith, catechism, constitution and rules of discipline may be changed in the manner therein pointed out. As was said by McCULLOUGH, C. J., of the Supreme Court of Arkansas: "How could language be broader or express greater power? The changes thus authorized cover everything for which the church stands, everything which justifies its separate existence, including doctrine, form of government and mode of worship. Even a change of name and separate identity fall within the wide sweep of this power." [Sanders v. Baggerly, 96 Ark. 117.]

Among the other comprehensive powers found in the constitution it is provided in section 43 "that the

Church Union With Larger Body: Change of Name: Surrender of Organization.

General Assembly shall have power . . . to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrine and order of this church; to authorize synods and presbyteries to exercise similar power in receiving bodies suited to become constituents of those courts and lying within their geographical bounds respectively.''

The contention of those who oppose union is that this section, while authorizing union by the General Assembly with a smaller organization, does not include the power to unite with a larger church and to take its name and ecclesiastical organization as its own. The comment on this contention by counsel for appellants in Wallace v. Hughes, supra, is so appropriate that we do not deem it improper to quote the substance of same: ''We are not able to understand the refinement of construction which admits that the Cumberland Assembly has the right to permit other churches to unite with it, yet had no right to allow it to unite with others; this is much like saying it is lawful for a man to wed but it is not lawful for any one to wed him. As we understand the contention of those opposing this union, it would have been regular if the uniting body had taken the name of the Cumberland Church and it had been a smaller organization than the church with which it became united.'' The absurdity of this interpretation of the powers granted by section 43 is to our mind apparent without analysis or argument. The luminous comment of Chief Justice MARSHALL in McCulloch v. Maryland, 4 Wheat. 316, upon the construction to be placed upon the language of a constitution is not inappropriate in this connection: ''A constitution, to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of the prolixity of a legal code, and could scarcely be understood by the human mind. Its nature, therefore, requires that only

its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects be deduced from the nature of objects themselves. . . . In considering this question, then, we must never forget, that it is a constitution we are expounding.''

The powers granted in the sections referred to, together with section 111, supra, and others not set forth above, but of like import, are, to state it conservatively, strongly indicative of the fact that the church courts have all the power under the Presbyterian form of government, save as limited by the constitution, and that it was not contemplated by the founders of either the mother church or its Cumberland offspring that the civil courts should be called upon to settle matters primarily ecclesiastical, although incidently involving property.

So completely has the power of the judicatories named been recognized and exercised in the governmental affairs of the church that, from the foundation of the parent association at Westminster Abbey in 1649 down to the carving out of the mother church of the Cumberland Church in 1810, no question has arisen in either organization as to any express, inherent or implied governmental powers of the individual members, and since that time in neither has such a right in the individual members been asserted until the meeting of the so-called Assembly of a minority of the Cumberland Church at Decatur, Illinois, after the union here under consideration had been effected.

The manner in which its constitution was framed and adopted is illustrative of the recognition by the Cumberland Church of the power of its General Assembly. Although organized in 1810 it did not attempt to adopt a constitution until 1883. When steps were taken to frame and adopt this formal compact, no vote of the individual membership or of the church sessions was taken, nor was it ever considered or claim-

ed that the same was an existing right or necessary to
the validity of the proposed instrument, but the en-
tire matter, in harmony with the nature of the organi-
zation as a representative body, was left to the con-
sideration and determination of the General Assembly
and the presbyteries. "If these bodies could thus, in
the absence of express authority, determine the form of
church government, the statement of its doctrine, the
rights and privileges of its members, and the powers
and duties of its various judicatories, it is clear they
must have power to do so now since the constitution
clearly confers it on them. Limitations are absent as to
the form or mode of exercising this power." The fore-
going is the gist of the reasoning on this subject by
Judge SHAW of the Supreme Court of California
(Com. of Mis. v. Pac. Synod, 157 Cal. 1. c. 124) who
concludes that "a formal amendment to the constitu-
tion is not a measure of this power; but it may be exer-
cised in any reasonable way, and hence a resolution
is authorized which declares that henceforth the rights,
privileges and powers of the members, ministers,
courts and subordinate bodies shall be enjoyed, not
separately as before, but in unison and conjunction
with another church of similar faith and government
but of different name." From which we are justified
in the conclusion that the exercise of this power by the
General Assembly and presbyteries is not dependent
for its validity upon the vote of the individual mem-
bers.

V. But it is contended that the existence of this
power may be admitted to exist in the judicatories
named, yet notwithstanding the civil courts have the
**Church Union: Property Rights: Examination of Creeds and Documents.** authority and it is their duty in investi-
gating property rights, to compare the
creeds of two churches attempting un-
ion and award the property to the part-
ies whether in the majority or the mi-

nority, who, in the judgment of such civil courts, have adhered to the faith and doctrines existing prior to the attempted union. The rule is thus announced here by a divided court in an elaborate and exhaustive opinion by GRAVES, J. (Boyles v. Roberts, 222 Mo. 613), in the reasoning and conclusions of which we are unable to agree. While the conclusion reached in the main opinion in Boyles v. Roberts, supra, is clear and unequivocal, as is characteristic of the utterances of the judge there speaking for the court, it is a question whether its effect as to the right of a civil court to review the decisions of an ecclesiastical tribunal incidentally affecting property rights, was not destroyed by the language employed in the opinion of the court (l. c. 696) overruling the motion for rehearing, concurred in by four judges, as follows: "In a case involving title to property, if a question arises as to the meaning of certain clauses in the Confession of Faith of a particular church and if the parties litigant are all members of the same church and if the highest ecclesiastical court of that church has put on the disputed clauses a certain interpretation, this court would adopt that interpretation as conclusive; but if the parties litigant on one side were not members of the church, we would have to take the written Confession of Faith and interpret it as we would any other written instrument."

The Supreme Court of Tennessee in Landrith v. Hudgins, 121 Tenn. 556, while admitting the inherent power of the church to unite with another, held as in Boyles v. Roberts, supra, that the civil courts would not be bound by the rulings of the church courts in disposing of the rights to church property.

We may, in the discussion of this branch of the instant case, without ignoring any apposite precedents, dismiss from consideration any cases from the English courts on account of the union between the Church and State in Great Britain, while in this country under both

the National and State Constitutions the civil authorities have no right to interfere in matters ecclesiastical.

The question as to the extent to which civil courts will interfere in the affairs of a church, where property rights are involved, has been considered and determined by many courts of last resort in our different States and by a number of subordinate tribunals. The rulings have not been wholly uniform, but the pronounced trend of authority is that if a church, as an organization, has created a tribunal, or, as termed in the Presbyterian government, a "judicatory," having jurisdiction to determine differences between its members as to creed, doctrine or discipline, the civil courts will not attempt to review or revise the judgments therein rendered. The lack of uniformity in the rulings of the civil courts consists in the fact that in some the decisions of the church courts are held to be persuasive and are followed by the civil courts except when they are held clearly to be wrong, while in others, if the matter in controversy relates to creed, doctrine or discipline, the judgment of the church court is held to be conclusive upon the civil courts, although property rights may be incidentally involved.

The Supreme Court of the United States, two United States Circuit Courts of Appeals, one United States District Court, the Supreme Courts of eleven of the States, and two State Courts of Appeals have held that the civil courts will not interfere with the judgments and decrees of the highest judicatories of churches in regard to church government or dogma, although property rights may be incidentally involved. The Supreme Courts of two States have held to the contrary. So much for the current of authority. The reasons adduced we have discussed elsewhere.

The leading case upon this subject is Watson v. Jones, 13 Wall. 679, which holds that where a right to property is asserted in a civil court dependent upon doctrine, discipline, church law, rule or custom, and

the question has been determined by the highest tribunal within the organization, the civil courts will accept that decision as conclusive and rule accordingly in a case before them. The rule announced in the Watson case is held not to apply (1) to property conveyed to a church where a specific trust has been imposed on same by the grantor or donor; nor (2) where the property is held by a church entirely independent of other religious associations and owes no fealty to a higher authority, but (3) it is held to apply to a class of cases in which property is acquired in any of the usual modes for the general use of a religious body which is itself an integral part of a larger organization, as is the fact in the instant case. State ex rel. Watson v. Farris, 45 Mo. 183, rests upon the doctrine announced in Watson v. Jones, supra, although decided several years before the latter case. The Watson-Farris case, supra, strongly and clearly declares in favor of the doctrine of noninterference by civil courts in the decisions of superior ecclesiastical tribunals, in accord with the present current of authority, but under a different state of facts the court in a later case (Watson v. Garvin, 54 Mo. 353) disapproved the position taken in the Watson-Farris case as to the binding effect of church courts upon the question of their own jurisdiction where property rights were dependent thereon, as is held in Boyles v. Roberts, supra.

In Mack v. Kime, 129 Ga. 1, 24 L. R. A. (N. S.) 675, the Supreme Court of Georgia held in effect, that where property is acquired by a church in the ordinary way by purchase or gift, (as in the case at bar) for the use of such church, the civil courts will only inquire as to who constitutes the church or its legal successors and award to them the use of the property, but will not in case of a schism in the organization, inquire into the existing religious opinions of those who adhere to the acknowledged organization.

In Presbyterian Church v. Cumberland Church, 245 Ill. 74, the Supreme Court of Illinois held that in a controversy over property between churches which are but subordinate members of a larger organization, and have a supreme church tribunal with general control over such churches and their property, which latter is not held under a special trust imposed by deed or devise, civil courts will be bound by the decision of the church's supreme judicatory as to who is entitled to the property.

In Sanders v. Baggerly, 96 Ark. 117, the Supreme Court of Arkansas held that the law was well established by the great weight of authority that on questions of church doctrine or discipline, in which property rights may be affected, the civil courts are governed exclusively by the decisions of the church courts or judicatories, where such courts are created and vested with authority under the constitution of a given church to decide those questions.

In Pleas. Gr. Cong. v. Riley, 248 Ill. 604, the Supreme Court of Illinois, following its former ruling in Presbyterian Ch. v. Cumberland Ch., supra, held that under the system of church government of the Cumberland Church the General Assembly is the highest authority and its decisions upon questions of faith and doctrine must be accepted as final and binding upon the civil courts.

In Brown v. Clark, 102 Tex. 323, it was held by the Supreme Court of Texas that the decision of the General Assembly of the Cumberland Church that there was no material difference between its articles of faith and those of the Presbyterian Church, was binding upon the civil courts as affecting the question of the succession to property.

In White Lick v. White Lick, 89 Ind. 136, the Supreme Court of Indiana held that where a schism occurs in a church organization which leads to a separation into distinct bodies, the respective claims of

such bodies to the control of church property must be determined by the church law accepted and adopted before the division took place, which will be recognized by the civil courts.

In Carothers v. Moseley, 99 Miss. 671, the Supreme Court of Mississippi held that the union between the Prebyterian and Cumberland Churches was an ecclesiastical question, and the decision of the highest judicatory under the Presbyterian form of government adjudging the union valid will be recognized by the civil courts, and the church court's decision that the united church is entitled to the property will be upheld.

In Harris v. Cosby, 173 Ala. 81, the Supreme Court of Alabama held that where a religious association holds property as a member of some general church organization in which there is a supreme ecclesiastical tribunal with general and ultimate power of control, its rulings will be recognized by the civil courts.

The great weight of authority supports the rule announced in the foregoing cases that the decisions of the highest court of a church as to purely ecclesiastical questions within the jurisdiction of such courts to decide, will be accepted as conclusive by the civil courts in the determination of property rights. The curious may consult in support of this conclusion these additional cases: Barkley v. Hayes, 208 Fed. 319; Perm. Com. of Miss. v. Pacific Synod, 157 Cal. 105; Trinity M. E. Church v. Harris, 73 Conn. 216, 50 L. R. A. 636; Ramsey v. Hicks, 174 Ind. 428, 30 L. R. A. (N. S.) 665; Lamb v. Cain, 129 Ind. 486, 14 L. R. A. 518; Brundage v. Deardorf, 34 C. C. A. 304, 92 Fed. 214; East Norway Lake Church v. Halvorson, 42 Minn. 503; Presby. Church v. Cumberland Church, 34 Okla. 503; Id. v. Id, 245 Ill. 74; Bentle v. Ulay, 175 Ind. 494; Middleton v. Ellison, 95 S. C. 158.

The rule that civil courts will not attempt to review or revise the judgments of the highest church

courts has its foundation in the provisions of the National and State constitutions having reference to religious freedom.   While Fussell v. Hail, 233 Ill. 73, is held not to involve a question of property rights, it nevertheless very clearly states the reason why the civil courts will not interfere with the rulings of purely ecclesiastical courts as follows: "Our constitution says: 'The free exercise and enjoyment of religious profession and worship, without discrimination, shall be forever guaranteed.' Such freedom . . . cannot be maintained if the civil courts may interfere in matters of church organization, creed and discipline, construe the constitution, canons or rulings of the church and regulate and revise its trials and the proceedings of its governing bodies."

VI.   Respondents contend, however, that the property in question is impressed with a specific religious trust and that they are holding to the faith adhered to by the church when the property was acquired, and consequently it should be awarded to them.   Is the assumption of the existence of a specific trust correct?

Church Property: Impressed With Specific Religious Trust.

Such a trust is created when property is deeded or donated for the express purpose of inculcating or advancing some particular form of faith or creed, and not where, as in this case, the property has been purchased by the organization for use as a house of worship or a minister's residence, and conveyed to the trustees of the church.

There is nothing in the deed under which the title passed to the church or the trustee in its behalf which limits the use of the property.. The presumption arising from this state of facts is that it was the intention of the grantor, or for that matter, the purchasers of the property, that the same be devoted to religious purposes in such a manner and way as the governing body shall, under the rules and the organic law, determine;

and so long as any religious organization can be reasonably ascertained to be that governing body or its regular successor it is entitled to be awarded the possession and use of the property. This rule has the well reasoned sanction of many cases in different jurisdictions, to-wit: Watson v. Jones, 80 U. S. 726; Wallace v. Hughes, supra; Mack v. Kime, supra; First Bap. Ch. v. Fort, 93 Tex. 215, 49 L. R. A. 617; Brown v. Clark, supra; McGinnis v. Watson, 41 Pa. St. 16; Com. of Mis. v. Pac. Synod, supra; Horsman v. Allen, 129 Cal. 136.

The mere conveyance of the property to the trustees of the Cumberland Church under the above authorities, does not create such a specific trust as will authorize the awarding of same to respondents; but it may be contended that it was purchased with donations made for and in aid of the church, and that this perforce creats a trust that would be violated and the funds perverted if the possession of the property be awarded to the united church.

In determining the nature of the tenure of the property, the fact must not be ignored that it was purchased by and conveyed to "the trustees of the Cumberland Church," and that the title thereto as a consequence is subject to such changes as may be made in the constitution and laws of the organization.

The identity of the Cumberland Church, save as to the word "Cumberland," is not lost. Its synods, presbyteries, church sessions and particular churches remain the same as before the union, except that they are now acting conjointly with the united church. Its confession of faith has been held by its highest judicatory, which holding has been approved by its presbyteries, to be the same as that of the united church. Can it, therefore, be reasonably contended that the elimination of the word "Cumberland" and the substitution in lieu thereof of the words "Presbyterian Church, U. S. A." destroys the identity of the former

and renders the latter a different and a distinct organization? There is nothing to support the contention that the property was purchased under a specific trust and that it be retained for the use of the church under any particular name or while the exact creed as defined in the articles and constitution of the Cumberland Church was being taught; on the contrary property deeded, devised or donated under the facts appearing here, whether for the use of a particular church or for the entire church, is not impressed with a specific trust, and its power to unite with another church of like faith and order carries with it, if need be, the power to eliminate its name and substitute another therefor, especially when it adheres to the generic term "Presbyterian" under which we designate the followers of the Calvinistic faith in this country. [Pleas. Grove Cong. v. Riley, 248 Ill. 604; Com. of Missions v. Pac. Synod, 157 Cal. 105.]

VII. The facts authorize the application of the doctrine of waiver in this case. This is a feature which does not appear from the evidence in Boyles v. Roberts, supra, and in this particular the cases may be clearly distinguished. It is well in the discussion of this branch of the case to mark out some of the distinctive differences between waiver and estoppel in order that the rules applicable to each may not be erroneously applied. As pithily put by RUSSELL, J., of the Court of Appeals of Georgia in Kennedy v. Manry, 6 Ga. App. 816, "while waiver is a member of the family of estoppel, an estoppel *in pais* has connections in nowise akin to waiver." Waiver is a voluntary surrender of some known advantage, benefit or right which, except for such waiver, the party would have enjoyed. This court, in Henderson v. Koenig, 192 Mo. 714, said: "A waiver occurs 'when one in possession of any right, whether conferred by law or

*Church Union: Waiver of Right to Property.*

by contract, and with full information of the material facts, does or forbears the doing of something inconsistent with the existence of the right or of his intention to rely upon it; thereupon he is said to have waived it, and he is precluded from claiming anything by reason of it afterwards.' ''

An estoppel most briefly stated is a previous act which precludes denial. While difficult at times to distinguish estoppel from waiver, these distinctive differences may be noted: Waiver, as defined, is the voluntary surrender of a right, while estoppel is the inhibition to assert a right from the mischief that has followed; waiver involves knowledge and intention, while estoppel may arise where there is no intention to mislead; waiver depends upon what he himself intends to do, while estoppel depends rather upon what he has caused his adversary to do; waiver may affect the other party beneficially, while estoppel results form an act which operates to the injury of the other party; waiver does not imply that one has been misled to his prejudice, while estoppel always involves this element. In short, waiver may be created by acts or declarations insufficient to create an estoppel. [Shaw v. Spencer, 100 Mass. 382; Libby v. Haley, 91 Me. 331; Kiernan v. Dutchess Co. Mut. Ins. Co., 150 N. Y. 190; Fairbanks, Morse & Co. v. Baskett, 98 Mo. App. 53; Insurance Co. v. Young, 86 Ala. 424; Cassimus Bros. v. Scottish Union & Natl. Ins. Co., 135 Ala. 256; Knarston v. Manhattan Life, 140 Cal. 57.]

These distinctions having been made, let us examine the facts as to the conduct of plaintiffs to enable it to be determined whether or not the doctrine of waiver may properly be applied. The declaration by the General Assembly that the union had been adopted as required by the constitution was made in May, 1905. In May, 1906, the Cumberland General Assembly adjourned *sine die* and immediately thereaf-

ter the minority who constituted the dissenting commissioners, formed the separate organization which styled itself "The Cumberland Church." With a full knowledge of these facts, plaintiffs not only remained in the Marshall church so far as their formal memberships were concerned, but they participated in all of the services; one of them was an elder and several others were officers who continued to discharge their respective duties as before the union. The relationship of plaintiffs as officers and members of the church after the union was in nowise different from that of defendants. This condition continued until December, 1906, or more than six months after the union had been effected, when plaintiffs withdrew from connection and communion with the Marshall church. However, it was not until March 29, 1907, that plaintiffs essayed to organize a separate congregation, and this suit for the possession of the property was not brought until November, 1909. For more than six months, therefore, plaintiffs, with seeming approval, not only acquiesced in the union, but personally participated in evident good faith in the various activities of the church. "Actions," says the homely adage, "speak louder than words," and no other reasonable construction of plaintiffs' conduct, measured by human experience, can be given than that they not only accepted but approved the action of their judicatories in effecting the union. This acceptance and approval, while lacking the essentials of estoppel, falls properly under the classification of a waiver. This court has said, not once, but many times, that no man is compelled to stand on a right given him by law. [Henderson v. Koenig, supra; Williams v. Railroad, 153 Mo. l. c. 519; Fulkerson v. Lynn, 64 Mo. App. 649.] Whatever this right may be, he may waive it if he chooses so to do, and without agreement or consideration, and lacking the essentials of an estoppel the waiver may be held to be valid and binding. The contention is not tenable

that plaintiffs were entitled to wait until the meeting of the congregation for the election of officers, six or seven months after the union had been consummated, before affirmatively announcing their opposition to the same. This could better and with more semblance of good faith have been done when the pastor of the church, who was the stated clerk of the General Assembly, returned from the meeting of that body in 1906 after the union had been effected, and publicly announced the action that had been taken by the church's highest judicatory. Of this plaintiffs were aware and, in fact, they well knew every step that had been taken, as did the membership of this and other congregations of like faith, because the matter was one of public notoriety, which had long been discussed, and the presumption might properly be indulged, if the record did not disclose the fact, that the members of the church at Marshall and elsewhere were familiar with the entire matter. Equity does not favor inertia where one in possession of all the facts fails to act; but we have more here than inaction, viz: acquiescence coupled with conduct, which rightly construed meant approval not for the nonce, but by repeated acts of fellowship and service for months after the Marshall church had been affiliated with the united church. Under these facts, which, if not expressly admitted are not denied, a court of conscience is asked to decree that the plaintiffs are entitled to the possession of the property in question. If no other sufficient reason existed to preclude our so holding, plaintiffs' pronounced waiver would suffice.

Comment upon the influence for good reasonably resulting from the union of two such religious organizations as we have here, we have avoided as beyond the province of a judicial opinion; we have therefore contented ourselves after having ascertained the facts, in applying the rules of law thereto necessary to determine the matter at issue. Whether we subscribe

to them or not, we respect the different forms of religious faith to which men give their honest allegiance, because each is in a way a factor for good, a helpful lever to lift civilization to a higher level. In this spirit, although our remarks may be gratuitous and irrelevant, we are impelled by history to award a meed of praise to the followers of the gloomy Genevan, who, while subscribing to what Taine calls the "harshest of all religious conceptions," have, nevertheless, everywhere at all times been the champions of human liberty. "To the Calvinists," says Motley, who was not of the faith, "more than to any other class of men, the political liberties of Holland, England and America are due." Mark also what Froude says in this regard: "If it be a creed of intellectual servitude, it has been able to inspire and sustain the greatest efforts ever made by man to break the yoke of unjust authority. When all else failed; when patriotism covered its face and human courage broke down; when intellect yielded, as Gibbon says: 'with a smile or a sigh,' content to philosophize in the closet or worship abroad with the vulgar; when emotion and sentiment and tender piety became the handmaids of superstition and forgot that there was any difference between lies and truth—that slavish belief called Calvinism, in one or the other of its forms, has ever borne an inflexible front to illussion and mendacity and has preferred rather to be ground to powder like flint than to bend before violence or melt under enervating temptation."

So much for the testimony of three witnesses who certainly cannot, on account of their personal convictions widely at a variance with Calvinism, be said to be biased. Buckle, Lecky, Bancroft, Carlyle, Macaulay and Greene render like testimony that the followers of this creed whether known as Puritans, Covenanters, Roundheads, Independents or Presbyterians, have in every land sustained the cause of liberty against

263Mo4

the tyranny of princes. It matters not, therefore, except as to the extent of its efforts for the emancipation of the individual, whether its churches be divided or united. Divided, each in its own sphere will work out its destiny; united, it will present a solid phalanx against all forms of oppression.

From all of the foregoing the conclusion follows that the judgment of the trial court is in error; the case will, therefore, be reversed and remanded, with directions to the circuit court to dissolve the injunction, dismiss plaintiffs' petition, and enter judgment in favor of the defendants for the possession of the property and against the plaintiffs for all costs.

*Lamm, C. J., Woodson* and *Faris, JJ.,* concur; *Brown, J.,* concurs in the result; *Bond, J.,* concurs in the result for the reason that plaintiffs ratified the church union; *Graves, J.,* dissents and files a separate opinion.

GRAVES, J. (dissenting).—I shall write but little in this dissent. For a full discussion of the question in this case I refer the curious to the opinion in Boyles v. Roberts, 222 Mo. 691. I dissent here for the reasons there expressed. It is indicated in the opinion here that the opinion of VALLIANT, C. J., in the Boyles case, supra, on motion for rehearing, modifies the original opinion. This is not true in any sense when the two opinions are carefully read. The distinguished Chief Justice in the very opening of his opinion says:

"The opinion of my learned brother GRAVES, *in which I concur,* so completely covers all the points in the case that I hesitate to attempt to add anything more, but in the motion for a rehearing there are two points urged with so much earnestness and force by the learned counsel for respondents that in deference to them I feel constrained to say a few words."

The italics are ours. Nor would the writer have concurred in such opinion on the motion for rehearing

it had it changed the original opinion "one jot or tit-
tle." These opinions, however, speak for themselves
and need not be further discussed.

In my brother's opinion it is said that the doc-
trine announced in the Boyles case, supra, to the ef-
fect that civil courts will compare the creeds of two
churches, and award the property to the church which
has adhered to the doctrine of the original church pri-
or to the scism, is not approved, or to be more exact,
that the Boyles case is not approved upon that ques-
tion. The Boyles case is not the only Missouri case
announcing the rule (as announced in Boyles case) that
civil courts will adjudge church creeds in performing
their constitutional duty of determining property
rights. The rule announced in the Boyles case was
the same rule announced in the following Missouri
cases: Watson v. Garvin, 54 Mo. l. c. 377, in an opin-
ion by ADAMS, J., concurred in by VORIES, SHERWOOD
and NAPTON, JJ.; Prickett v. Wells, 117 Mo. l. c. 504,
by BARCLAY, J., concurred in by BLACK, C. J., and MAC-
FARLANE, J.; BRACE, J., taking no part; Fulbright v.
Higginbotham, 133 Mo. l. c. 677, by MACFARLANE, J.,
concurred in by BRACE, P. J., and BARCLAY and ROBIN-
SON, JJ.; and Russie v. Brazzell, 128 Mo. l. c. 113, by
MACFARLANE, J., in which BRACE, P. J., BARCLAY and
ROBINSON, JJ., concurred. So that omitting the con-
currence of VALLIANT, C. J., and BURGESS and Fox, JJ.,
in the Boyles case, we have the concurrence of nine
former judges of this court to the rule announced in
the Boyles case. Including the Boyles case we have
the judgment of thirteen judges of this court upon
the exact doctrine now disowned. With the views of
these judges I am as yet satisfied, and accordingly
dissent to the opinion in this case.